## NATIONAL LABOR RELATIONS BOARD *v.* E. C. ATKINS & CO.

No. 419.   Argued March 7, 10, 1947.—Decided May 19, 1947.

*Ruth Weyand* argued the cause for petitioner. With her on the brief were *Acting Solicitor General Washington, Gerhard P. Van Arkel, Morris P. Glushien* and *Mozart G. Ratner.*

*Frederic D. Anderson* argued the cause for respondent. With him on the brief was *Kurt F. Pantzer.*

MR. JUSTICE MURPHY delivered the opinion of the Court.

The problem posed by this case is whether private plant guards, who are required to be civilian auxiliaries to the military police of the United States Army, are employees within the meaning of § 2 (3) of the National Labor Relations Act, 29 U. S. C. § 152 (3).

At all material times, the respondent corporation was engaged in the manufacture of saws, tools and armor plate. It employed more than 1,200 production and maintenance employees at its two plants at Indianapolis, Indiana. Before it began to produce armor plate for defense and war purposes, respondent employed about six watchmen or guards. When it entered upon war production, however, the War Department required that an auxiliary military police force of sixty-four members be established to guard the plants.

In 1943, after the necessary additional guards had been recruited, a union [1] petitioned the National Labor Rela-

---

[1] Local 1683 of the International Association of Machinists, District 90. This union did not represent any of the maintenance or produc-

tions Board for investigation and certification of representatives pursuant to § 9 (c) of the Act. It was alleged that the union represented the sixty-four plant guards employed by respondent at its two plants. The respondent moved to dismiss the petition on the ground that it was not the employer of the guards within the meaning of § 2 (2) and that the guards were not employees as defined by § 2 (3). A hearing was thereupon held and evidence concerning the status of the guards was introduced.

On October 19, 1943, the Board concluded from the evidence thus submitted that these plant guards were employees within the meaning of § 2 (3) despite their status as civilian auxiliaries to the military police. 52 N. L. R. B. 1470. It held that all the plant guards at respondent's two plants, excluding the chief guards, lieutenants and all other supervisory employees with authority to hire, promote, discharge, discipline, or otherwise effect changes in the status of employees, or effectively recommend such action, constituted a unit appropriate for collective bargaining. An election was therefore directed to be held, which resulted in the union in question being chosen as bargaining representative. The union was certified by the Board as the exclusive representative of the plant guards.

Subsequently, the union filed charges that the respondent had refused to bargain collectively. A complaint was issued by the Board, followed by a hearing at which evidence regarding that refusal was introduced. The Board, on May 30, 1944, issued its decision in which it concluded that the guards were employees of respondent and that the latter had committed unfair labor practices in refusing to bargain with the union. 56 N. L. R. B. 1056.

tion employees in respondent's plants, but it did admit to membership plant protection employees of other employers as well as those of respondent.

The Board accordingly issued an order requiring respondent to cease and desist from refusing to bargain collectively with the union, and commanding it to bargain with the union, upon request, in respect to rates of pay, wages, hours of employment and other conditions of employment. The Seventh Circuit Court of Appeals declined to enforce the Board's order, holding (1) that the guards were not employees of the respondent within the meaning of § 2 (3) of the Act since they were militarized, and (2) that even if the militarized guards were to be considered as employees of respondent, enforcement of the Board's order should not be allowed because to do so would be or would likely be inimical to the public welfare. 147 F. 2d 730.

In filing a petition in this Court for a writ of certiorari, the Board noted that the guard forces at respondent's plants had been demilitarized early in 1944, but urged that the case was not thereby rendered moot. We granted certiorari, vacated the judgment below and remanded the case to the Circuit Court of Appeals "for further consideration of the alleged changed circumstances with respect to the demilitarization of the employees involved, and the effect thereof on the Board's orders." 325 U. S. 838.

The Board and the respondent entered into a stipulation relative to the dates and circumstances of the demilitarization of the guards. The stipulation noted that most of the guards had been released from service and that only eleven of them had been retained as watchmen by respondent as of February 23, 1946; and those eleven had been "sworn in as Deputy Policemen by the City of Indianapolis." The Board then filed a motion in the Circuit Court of Appeals for a decree enforcing its order. This motion was denied and the prior holding was reaffirmed, the court stating that the demilitarization was irrelevant to the issue of whether the plant guards were

employees at the time when the respondent refused to bargain with the union. 155 F. 2d 567. The importance of the problem raised by the case, together with a conflict over the answer to this problem between the court below and the Sixth Circuit Court of Appeals, *Labor Board* v. *Jones & Laughlin Steel Corp.*, 146 F. 2d 718, prompted us to grant a further review of the case.

We agree with the Circuit Court of Appeals that the demilitarization of the guards did not render the case moot and that it had no effect upon the prime issue in the case. The Board's order was based upon a holding that the respondent committed an unfair labor practice by refusing to recognize and bargain with the union selected by the militarized guards. And that refusal occurred at a time when the guards were still militarized. A determination that the respondent had a statutory duty to bargain with the union at that time is therefore essential to the validity of the Board's order. The fact that the guards were subsequently demilitarized did not affect their status as employees at this crucial juncture; nor did it relieve respondent of any duty to bargain that it might otherwise have had at that point.

The Board's order, moreover, was a continuing direction to bargain collectively with the union designated by the guards. Demilitarization has not dispensed with whatever duty respondent may have now or in the future to comply with that order. If the guards were employees of respondent entitled to the benefits of the Act during the period of militarization, *a fortiori* they are employees now that all connections with the Army have been severed; and their statutory rights continue to be entitled to full respect. Respondent's guard force still remains in existence, although considerably reduced in size, and the union presumably continues to be the representative of the guards. Under such circumstances, the case is not moot. *Labor Board* v. *Greyhound Lines,* 303 U. S. 261, 271; *J. I.*

*Case Co.* v. *Labor Board,* 321 U. S. 332, 334. See also *Federal Trade Commission* v. *Goodyear Co.,* 304 U. S. 257, 260.

As to the merits, it is elementary that the Board has the duty of determining in the first instance who is an employee for purposes of the National Labor Relations Act and that the Board's determination must be accepted by reviewing courts if it has a reasonable basis in the evidence and is not inconsistent with the law. *Labor Board* v. *Hearst Publications,* 322 U. S. 111. Realizing that labor disputes and industrial strife are not confined to those who fall within ordinary legal classifications, Congress has not attempted to spell out a detailed or rigid definition of an employee or of an employer. The relevant portion of § 2 (3) simply provides that "The term 'employee' shall include any employee, . . ." In contrast, § 2 (2) states that "The term 'employer' includes any person acting in the interest of an employer, directly or indirectly, . . ." As we recognized in the *Hearst* case, the terms "employee" and "employer" in this statute carry with them more than the technical and traditional common law definitions. They also draw substance from the policy and purposes of the Act, the circumstances and background of particular employment relationships, and all the hard facts of industrial life.

And so the Board, in performing its delegated function of defining and applying these terms, must bring to its task an appreciation of economic realities, as well as a recognition of the aims which Congress sought to achieve by this statute. This does not mean that it should disregard the technical and traditional concepts of "employee" and "employer." But it is not confined to those concepts. It is free to take account of the more relevant economic and statutory considerations. And a determination by the Board based in whole or in part upon those considerations is entitled to great respect by a reviewing court, due to the

Board's familiarity with the problems and its experience in the administration of the Act.

Laying aside for the moment the matter of militarization, we cannot say in this case that the Board would be legally unjustified in holding that the rank-and-file plant guards are employees within the meaning of the Act. They bear essentially the same relation to management as maintenance and production employees. In fact, they are indistinguishable from ordinary watchmen, gatemen, patrolmen, firemen and guards—persons who have universally been regarded and treated as employees for purposes of union membership and employee benefits. They perform such duties as inspecting persons, packages and vehicles, carrying cash to various parts of the plant, and generally surveying the premises to detect fires, suspicious circumstances and sabotage. Moreover, the guards in question are not supervisors; they possess no power to affect the working conditions of other employees. Without collective bargaining, they are subject to the unilateral determination by the employer of their wages, hours, seniority, tenure and other conditions of work. Individually, they suffer from inequality of bargaining power and their need for collective action parallels that of other employees. From any economic or statutory standpoint, the Board would be warranted in treating them as employees. Even under conventional standards, they are controlled by management to an extent sufficient to justify designating them as employees.

Nor can we say, as a matter of law, that permitting plant guards to be considered as employees entitled to the benefits of the Act would make them any less loyal to their employer in carrying out their designated tasks. In guarding the plant and personnel against physical danger, they represent the management's legitimate interest in plant protection. But that function is not necessarily inconsistent with organizing and bargaining with the em-

ployer on matters affecting their own wages, hours and working conditions. They do not lose the right to serve themselves in these respects merely because in other respects they represent a separate and independent interest of management. As in the case of foremen, we see no basis in the Act whatever for denying plant guards the benefits of the statute when they take collective action to protect their collective interests. *Packard Motor Car Co.* v. *Labor Board,* 330 U. S. 485.

We cannot assume, moreover, that labor organizations will make demands upon plant guard members or extract concessions from employers so as to decrease the loyalty and efficiency of the guards in the performance of their obligations to the employers. There is always that possibility, but it does not qualify as a legal basis for taking away from the guards all their statutory rights. In other words, unionism and collective bargaining are capable of adjustments to accommodate the special functions of plant guards.

The crucial problem in this case, however, is whether the militarization of the plant guards changed their status as employees as a matter of law so as to prohibit the Board from extending to them the benefits of the Act which they would otherwise have. The short answer to that problem is that militarization as such does not necessarily change the status of plant guards. It may or may not bring about a change, depending upon the particular circumstances. The militarization may be a qualified one; the employer may retain power to fix wages, hours and other conditions of work; the need and desirability for collective action on the part of the guards may exist as to the matters over which the employer retains control; and a recognition of the statutory rights of the guards may be entirely consistent with their military obligations. If that is the case, the guards remain employees for purposes of the Act. But if the militarization is such as to transfer to the Army all

the matters over which the employer would normally have control, matters which would form the basis for collective bargaining as contemplated by the Act, the guards may lose their status as private employees within the purview of the statute.

The Board's determination that the militarization of the guards in respondent's plants was of a type that did not alter their status as employees under the Act must therefore be tested by the applicable War Department regulations and by the evidence introduced at the hearing before the Board. If such a result is consistent with the regulations and has a reasonable basis in the other evidence, the Board's order must be sustained.

The plant guards in this case were enrolled as civilian auxiliaries to the military police under War Department regulations issued pursuant to Executive Order No. 8972, dated December 12, 1941. That order authorized the Secretary of War to establish and maintain military guards and patrols, and to take other appropriate measures, to protect certain strategic premises, materials and utilities from injury and destruction. The Secretary of War accordingly directed the military organization of plant guard forces as auxiliary military police at plants important to the prosecution of the war, the directive to that effect being issued by the Adjutant General on July 2, 1942. Supplementary regulations were contained in Circular No. 15, issued on March 17, 1943, by Headquarters, Army Service Forces.[2]

As stated by these regulations, the purpose of the military organization of the plant guards was "to increase the authority, efficiency, and responsibility of guard forces

---

[2] Circular No. 15 was not introduced into evidence in the proceeding before the Board. But it was issued by military authorities pursuant to the power vested in the Secretary of War by Executive Order No. 8972 and we may take judicial notice of it. *Standard Oil Co.* v. *Johnson,* 316 U. S. 481, 483–484.

at plants important to the prosecution of the war, and through military training to provide auxiliary forces throughout the United States to supplement the Army in wartime emergency situations." [3] It was made clear, however, that plant managements were not relieved of their responsibility "for providing adequate protection at all times against all hazards." [4] In other words, employers who wished to obtain government contracts for the production of war materials were required to provide "adequate protection" for their plants where the material was to be produced; if the existing plant protection forces were inadequate, additional guards were to be recruited by the employers. But all the original and additional guards were to be enrolled as civilian auxiliaries to the military police.

The military authorities reserved the right to veto the hiring or firing of any plant guard where such action by the employer might impair the efficiency of the guard force. [5] And the military plant guard officers were authorized to take appropriate action "through the plant management" to correct conditions which might result in "defective or inadequate performance by the guard forces of its ordinary protective duties." [6]

The functions of these civilian auxiliaries to the military police were stated to be twofold: "(1) To provide internal and external protection of the plant against sabotage, espionage, and natural hazards. (2) To serve with the Army in providing protection to the plant and its environs in emergency situations." [7] They were subject to call for military service even where emergencies arose at places other than the plants where they normally

---

[3] Circular No. 15, par. 1a.

[4] *Id.* par. 1b.

[5] *Id.* par. 6b (2).

[6] *Id.* par. 1b.

[7] *Id.* par. 2a.

worked. To these ends, military plant guard officers were authorized to exercise direct control over the guard forces "only in matters relating to military instruction and duties as Auxiliary Military Police." [8] But such orders "will be issued only after consultation with and, if possible, concurrence by the plant management. . . . Control, therefore, will be exercised as heretofore through the plant management except at drill and except in emergency situations. Although the plant guard officers will be in command at all times, *they will not supplant the civilian guard officers,* and unless expediency demands otherwise will exercise their authority through the chain of command established by the plant management." [9] The regulations also provided that the military drill of the guard forces should not exceed one hour per week "except with the approval of the plant management." [10]

As to the employer's relations with the guard force, the regulations were explicit in recognizing that those relations remained essentially the same as if there were no militarization. According to Circular No. 15: "Basically, the militarization of plant guard forces does not change the existing systems of hiring, compensation, and dismissal; all remain primarily a matter between the guards and the plant managements. Guards in the employ of a private employer may, as heretofore, be dismissed by that employer." [11] A veto power over employment and dismissal, of course, was retained by the military. It was further provided: "The status of the employer in respect to the employee benefits for the guard force is not changed. For example, social security, workmen's compensation, and

---

[8] *Id.* par. 5a (2).

[9] *Id.* pars. 5c (2) and 6a (1).

[10] *Id.* par. 7g (1).

[11] *Id.* par. 6b (1).

employer's liability provisions remain unaffected."[12] And the employer was expected to train the guard forces in their ordinary protective duties and was required to furnish them with uniforms and weapons.[13]

The right of the plant guards to bargain collectively was recognized by Circular No. 15, paragraph 6h (2) of which provided: "Auxiliary Military Police are permitted to bargain collectively, but no such activity will be tolerated which will interfere with their obligations as members of the Auxiliary Military Police. In view of recent decisions by the National Labor Relations Board (see In re Lord Mfg. Co. & United Rubber Workers of America, CIO, Case No. R–4826, February 1943) [*Lord Manufacturing Co.,* 47 N. L. R. B. 1032], the Auxiliary Military Police should be represented in collective bargaining with the management by a bargaining unit other than that composed of the production and maintenance workers, although both bargaining units may be affiliated with the same labor organization. Where the guards are not now included in the same bargaining unit, this is mandatory; where the guards are included in such unit, serious consideration will be given to effect a change to conform to the foregoing policies." Provision was also made that collective bargaining agreements covering plant guards who were civilian auxiliaries should include a clause recognizing that nothing in the collective bargaining relationship should interfere with the duties imposed upon the guards as auxiliary military police.[14]

---

[12] *Id.* par. 6f.

[13] The guards were required to salute Army officers and had the right to arrest anyone in the plants. They carried identification cards issued by the War Department and wore arm bands on which appeared the words "Auxiliary Military Police." *Id.* par. 7.

[14] *Id.* par. 6h (1).

The guards were required to sign agreements with the United States.[15] Each agreement stated that the individual, who had been or was about to be employed by the particular company as a guard at its plant, agreed that he would support and defend the Constitution, bear true faith and allegiance to the Constitution, and faithfully discharge his duties as a civilian auxiliary to the military police. He also acknowledged in this agreement that appropriate Articles of War had been read and explained to him and that he was subject to military law during his employment. The applicable regulations then provided that he could be court-martialed where no other effective form of punishment would be effective. But "Unlike the court-martial punishment of a person in military service, a court martial cannot punish a member of the Auxiliary Military Police by reduction in military grade or by forfeiture of pay and allowances. Analogous punishments might be imposed, such as reduction in grade in the guard organization or temporary suspension from duty. A fine, as distinguished from forfeiture, is regarded as an appropriate form of punishment." [16] In all other respects, the guards remained subject to the civil courts.

The evidence and testimony submitted to the Board confirmed the fact that the plant guards in respondent's two plants were militarized in accordance with the foregoing regulations. The guards at each plant were under the direct supervision of a chief guard and several lieutenants—all of whom were civilians recruited by the respondent like the rank-and-file guards. The military superior of the chief guards was the District Plant Guard Officer

---

[15] If a guard refused to sign this agreement, he might be, but need not be, temporarily retained with the understanding that he would be dismissed as soon as he could be replaced, and in any event within a reasonable time. *Id.* par. 5b (1).

[16] *Id.* par. 8d.

stationed at the Continuous Security District Office of the War Department, Cincinnati, Ohio, an officer who also had charge of guard forces at other plants in the district. A general directive issued by this office repeated many of the provisions of Circular No. 15.[17] It also provided that orders and regulations for the auxiliary military police would be issued in the name of the Chief of the District "after plant management has indicated its concurrence by signing the guard order in the lower left hand corner." But the only guard orders received by the chief guards at respondent's plants were three general ones signed by the District Plant Guard Officer, orders that were applicable to all militarized guards in the district. All the specific orders that were ever issued emanated from the chief guards. About the only direct contact between the military authorities and these guards occurred during the weekly drill period.

Respondent recruited the necessary additional guards through its ordinary employment channels and it had the power to initiate dismissals from the force. Such actions, however, were subject to the approval of the military. Respondent at all times carried the guards on its regular pay rolls, determined their rate of compensation and paid their wages after making appropriate deductions. And since it did not operate on a cost-plus basis, respondent actually bore the cost of the guards' wages.[18] Respondent

[17] This directive, however, omitted par. 6h (2) of Circular No. 15, dealing with the right of guards to bargain collectively.

[18] Respondent argues that it was forced to pay the guards because of the War Department's action in requiring additional plant protection. But respondent was not forced to enter into its war production contracts with the Government. It did so voluntarily and with the understanding that it would comply with any terms and conditions the Government saw fit to impose. One of these conditions was that respondent expand its peacetime guard force of six men to a wartime complement of sixty-four. So far as these additional guards being

did not attempt to give orders to the guards, merely making suggestions to the chief guards. The latter worked in close cooperation with respondent's personnel manager and no friction developed. Respondent delegated to the chief guards its power to determine the guards' working hours and the promotion policies in regard to them. Finally, respondent maintained its liability as to the guards on matters of social security and workmen's compensation and was obliged to obey all minimum wage and maximum hour requirements.

From the foregoing, an ample basis is evident to support the Board's determination that militarization did not destroy the employee status of the guards in respondent's plants. The War Department regulations and the actual practice in these plants were based upon the explicit assumption that the guards were the private employees of respondent rather than employees or soldiers of the United States. The regulations made it unmistakable that the normal, private employer-employee relationship was to remain substantially intact. Especially clear was the fact that the right of the guards to join unions and to bargain collectively was to be respected. The military authorities took over from respondent only those attributes of control which were necessary to effectuate the rather limited military program, many aspects of that transferred power being exercisable by the Army only in the gravest emergencies.

We cannot say that the Board was without warrant in law or in fact in concluding that respondent retained "a sufficient residual measure of control over the terms and conditions of employment of the guards" so that they

respondent's employees is concerned, it is no different from a requirement that respondent employ more chemists or other production experts to facilitate execution of the contracts.

might fairly be described as employees of respondent.[19] The most important incidents of the employer-employees relationship—wages, hours and promotion—remained matters to be determined by respondent rather than by the Army. Respondent could settle those vital matters unilaterally or by agreement with the guards. And the guards were free to negotiate and bargain individually or collectively on these items. It is precisely such a situation to which the National Labor Relations Act is applicable. It is a situation where collective bargaining may be appropriate and where statutory objectives may be achieved despite the limitations imposed by militarization. Under such circumstances, the Board may properly find that an employee status exists for purposes of the Act.

In this setting, it matters not that respondent was deprived of some of the usual powers of an employer, such as the absolute power to hire and fire the guards and the absolute power to control their physical activities in the performance of their service. Those are relevant but not exclusive indicia of an employer-employee relationship under this statute. As we have seen, judgment as to the existence of such a relationship for purposes of this Act must be made with more than the common law concepts in mind. That relationship may spring as readily from the power to determine the wages and hours of another,

---

[19] The Board's conclusion in this respect is confirmed by the results reached under other statutes. Militarized guards have been treated as private employees for purposes of the Fair Labor Standards Act. *Walling* v. *Lum*, 4 WH Cases 465. And they have consistently been treated as such by the National War Labor Board. *Detroit Steel Products Co.*, 6 War Lab. Rep. 495; *Brewster Aeronautical Corp.*, 11 War Lab. Rep. 286, 15 War Lab. Rep. 239, 240–243; *Great American Industries*, 11 War Lab. Rep. 287; *Youngstown Sheet & Tube Co.*, 15 War Lab. Rep. 500, 19 War Lab. Rep. 813; *General Motors Corp.*, 18 War Lab. Rep. 541. And see *Labor Board* v. *Carroll*, 120 F. 2d 457.

coupled with the obligation to bear the financial burden of those wages and the receipt of the benefits of the hours worked, as from the absolute power to hire and fire or the power to control all the activities of the worker. In other words, where the conditions of the relation are such that the process of collective bargaining may appropriately be utilized as contemplated by the Act, the necessary relationship may be found to be present. *Labor Board* v. *Hearst Publications, supra,* 129.

The Board's determination that there was a relationship in this case deserving of statutory protection does not reflect an isolated or careless reconciliation of the rights guaranteed by the Act with the important wartime duties of plant protection employees. In the course of its administration of the Act during the war, the Board was faced with this problem many times.[20] It was well acquainted with the important and complex considerations inherent in the situation. The responsibility of representing the public interest in such matters and of reaching a judgment after giving due weight to all the relevant factors lay primarily with the Board. See *Southern Steamship Co.* v. *Labor Board,* 316 U. S. 31, 47. In the absence of some compelling evidence that the Board has failed to measure up to its responsibility, courts should be reluctant to overturn the considered judgment of the Board and to substitute their own ideas of the public interest. We find no such evidence in this case.

Here we have the Board's considered and consistent judgment that militarized plant guards may safely be permitted to join unions and bargain collectively and that their military duties and obligations do not suffer thereby.

---

[20] See, *e. g., Chrysler Corporation,* 44 N. L. R. B. 881; *Budd Wheel Co.,* 52 N. L. R. B. 666; *Dravo Corporation,* 52 N. L. R. B. 322. See also National Labor Relations Board, Seventh Annual Report (1943), p. 63; Eighth Annual Report (1944), p. 57.

In agreement with that viewpoint has been the War Department, the agency most directly concerned with the military aspects of the problem. Its regulations and directives have clearly acknowledged the feasibility of recognizing collective bargaining rights of these guards during wartime, provided only that no encroachment is made upon military necessities. This policy of the Board, moreover, has been confirmed by experience. The Board states that it has certified bargaining representatives for units of militarized guards in more than 105 cases, in none of which has any danger to the public interest or to the war effort resulted.

Under such circumstances, it would be folly on our part to disregard or to upset the policy the Board has applied in this case.[21] Since the Board's order is in accord with the law and has substantial roots in the evidence, it should have been enforced by the Circuit Court of Appeals. Respondent's objections to the language and scope of the order are either without merit or have been removed by the demilitarization of the guards. And any issues concerning the subsequent deputization of the guards as policemen are answered by our decision in *Labor Board* v. *Jones & Laughlin Steel Corp., post,* p. 416. The judgment below is accordingly

*Reversed.*

THE CHIEF JUSTICE, MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON dissent substantially for the reasons set forth in the opinion of the court below, 155 F. 2d 567.

---

[21] In adopting the War Labor Disputes Act, 57 Stat. 163, Congress provided in § 7 (a)(2) that all actions of the National War Labor Board must conform to the provisions of the National Labor Relations Act—an indication that Congress deemed the preservation of the right to collective bargaining to be essential in war industries.