343 F.2d 60
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
RANDOLPH ELECTRIC MEMBERSHIP CORPORATION, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TRI-COUNTY ELECTRIC MEMBERSHIP CORPORATION, Respondent.
 Nos. 9437, 9438.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 7, 1964.
Decided March 3, 1965.
 
 Melvin J. Welles, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Hans J. Lehmann, Atty., National Labor Relations Board, on brief), for petitioner.
 Thornton H. Brooks and Thos O. Moore, Jr., Greensboro, N.C. (Deane F. Bell, Asheboro, N.C., William T. Crisp, Raleigh, N.C. and Herbert B. Hulse, Goldsboro, N.C., on brief), for respondent.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit judges.
 SOBELOFF, Chief Judge.
 
 
 1
 The National Labor Relations Board has petitioned for enforcement of its orders entered against the Randolph Electric Membership Corporation and the Tri-County Electric Membership Corporation in two separate proceedings, requiring them to bargain with the union it had certified.
 
 
 2
 Both Randolph and Tri-County are incorporated under the provisions of the Electric Membership Corporation Act of North Carolina[1] and have obtained substantial loans from the Rural Electrification Administration, a federal instrumentality created by the Rural Electrification Act of 1936.[2] Both are nonprofit corporations whose rural memberships consist predominantly of farm and residential consumers of electricity. Each is engaged in the distribution and sale to its members of electric power which it has purchased from the Carolina Power and Light Company, a privately owned utility, and the Southeastern Power Administration, an agency of the federal Government.
 
 
 3
 Following Board certification of Local Union No. 485 of the International Brotherhood of Electrical Workers as bargaining representative of the employees of both Randolph and Tri-County, the union requested the start of bargaining negotiations. Both refused to grant recognition and bargain with the union on the sole ground that they are not 'employers' within section 2 of the National Labor Relations Act, 29 U.S.C.A. 152 (1956), but 'political subdivisions' of the state of North Carolina and thus expressly excluded from coverage by the terms of the Act.[3] The Board held that they are 'employers' within the meaning of the Act, and not 'political subdivisions' as contended. It consequently found that their refusals to bargain with the union constituted unfair labor practices violative of sections 8(a)(5) and (1) of the Act, 29 U.S.C.A. 158(a)(5) and (1) (1956).
 
 
 4
 The case turns then on the sole issue, whether Randolph and Tri-County are 'political subdivisions' within the meaning of the National Labor Relations Act.
 
 
 5
 The term 'political subdivision' is not defined in the Act and its legislative history is silent as to the purpose of Congress in using these words. We do not, however, write on a clean slate in construing their meaning. Congress has assigned that function to the National Labor Relations Board, and we look to what it has decided in this and in earlier cases. Here the Board's initial determination as to the specific application of broad statutory terms rests on its familiarity with labor problems and its experience in the administration of the Act. To the extent that it has taken into account economic realities as well as the statutory purposes, the Board's determination is entitled to great respect. National Labor Relations Board v. E. C. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947). Our function as a reviewing court is limited to determining whether the Board's conclusion has 'warrant in the record' and 'a reasonable basis in law.' National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); National Labor Relations Board v. E. C. Atkins & Co.,supra.
 
 
 6
 For the reasons to be stated we conclude that the Board's orders were properly issued and are entitled to enforcement.
 
 
 7
 The main thrust of the electric corporations' argument is that by excepting 'political subdivisions' from the Act's coverage, Congress wished to disclaim federal jurisdiction and also evidenced an intention that state law declarations and interpretations should control in determining whether an organization is a 'political subdivision.' The corporations assert that it is only in situations:
 
 
 8
 'where Congress has statutorily asserted federal jurisdiction over enterprises that had theretofore been exclusively under state control * * * that courts will disregard state law in an effort to derive a construction of uniform national application.'
 
 
 9
 Their argument then continues that, because North Carolina's legislature declared and several successive Attorneys General have ruled that corporations formed under the Electric Membership Corporation Act of North Carolina are 'political subdivisions,' it follows that they are exempt from coverage by the National Labor Relations Act.
 
 
 10
 There are, of course, instances in which the application of certain federal statutes may depend on state law. Examples are seen in the Reconstruction Finance Corporation Act,[4] and in the assimilative crimes statute.[5]
 
 
 11
 But this is controlled by the will of Congress. In the absence of a plain indication to the contrary, however, it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law. Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943).
 
 
 12
 The argument of the electric corporations fails to persuade us that Congress intended the result for which they contend. Furthermore, it ignores the teachings of the Supreme Court as to the congressional purpose in enacting the national labor laws. In National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 123, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944), the Court dealt with the meaning of the term 'employee' as used in the Wagner Act, saying:
 
 
 13
 'Both the terms and the purposes of the statute, as well as the legislative history, show that Congress had in mind no * * * patchwork plan for securing freedom of employees' organization and of collective bargaining. The Wagner Act is federal legislation, administered by a national agency, intended to solve a national problem on a national scale. * * * Nothing in the statute's background, history, terms or purposes indicates its scope is to be limited by * * * varying local conceptions, either statutory or judicial, or that it is to be administered in accordance with whatever different standards the respective states may see fit to adopt for the disposition of unrelated, local problems.'
 
 
 14
 Thus, it is clear that state law is not controlling[6] and that it is to the actual operations and characteristics of Randolph and Tri-County that we must look in deciding whether there is sufficient support for the Board's conclusion that they are not 'political subdivisions' within the meaning of the National Labor Relations Act.
 
 
 15
 Like all other North Carolina electric membership corporations, Randolph and Tri-County are organized and operate pursuant to the provisions of the North Carolina Electric Membership Corporation Act. This authorizes the formation of a rural electric membership corporation upon approval of its feasibility by the North Carolina Rural Electrification Authority. The Authority is an agency created directly by the state, whose members are appointed by the Governor; and after the Authority has found the feasibility of the proposed formation of an electric membership corporation and approved any application for loans from the federal Rural Electrification Administration, the Authority exercises no regulatory control over the corporation. The directors of each rural electric corporation are elected independently of the Authority by the corporation's own members. The directors of the corporation, not the Authority, conduct the corporate business. Each electric membership corporation possesses the usual powers of a private corporation except that it is under a duty to make membership available without arbitrary or unreasonable limitations.
 
 
 16
 The Board held that Randolph and Tri-County are not 'political subdivisions' because they are neither created directly by the state nor administered by state-appointed or publicly elected officials.[7] Its decision rested also on the facts (1) that the North Carolina statute does not subject operations of electric membership corporations to substantial control or supervision, either by the state or by its Rural Electrification Authority, (2) that these corporations are formed for the exclusive benefit of its own members, (3) do not have the power of eminent domain, and (4) are not empowered to exercise any portion of the sovereign power of the state of North Carolina.
 
 
 17
 In a series of cases beginning with Gibson County Electric Membership Corporation, 65 N.L.R.B. 760 (1946), involving a Tennessee rural electric cooperative, the Board has taken jurisdiction over nonprofit cooperative associations located in various sections of the country which received financial assistance from the federal Rural Electrification Administration.[8] Recently, this court granted enforcement of the Board's order entered against Craig-Botetourt Electric, a Virginia cooperative. N.L.R.B. v. Craig-Botetourt Elec. Co-op., 337 F.2d 374, 375 (4th Cir. 1964).
 
 
 18
 Randolph and Tri-County concede that their operations are similar to those of electric cooperatives in other states. They are neither owned nor operated by the state; their officers are not publicly appointed but elected by their own members, as in every privately owned utility; they are regulated in their day-to-day operations in the same manner as other privately owned public service corporations. They stress, however, that, unlike other states, North Carolina had labeled them 'political subdivisions.' The fact that North Carolina sees fit to characterize such corporations as 'political subdivisions' and to accord them certain benefits in respect to state taxation and otherwise, which are normally enjoyed only by municipal corporations, counties and political subdivisions, is not decisive of the question before us, since their relation to the state and their actual methods of operation do not fit the label given them.
 
 
 19
 The argument is made that several rulings of the United States Treasury Department indicate that Randolph and Tri-County are 'political subdivisions.' These rulings, however, point in several directions,[9] and are not helpful to the argument. In any event, these rulings of the Internal Revenue Service are not determinative of the meaning of the section 2(2) exemption for purposes of the National Labor Relations Act.
 
 
 20
 Nor do we perceive any force in the argument advanced by Randolph and Tri-County that it would be illegal under the law of North Carolina[10] for them to recognize, bargain with, or enter into collective bargaining agreements with the union, for under the Supremacy Clause of the Constitution, the state's jurisdiction to regulate labor relations is limited to matters not pre-empted by federal labor legislation. Division 1287 Amalgamated Ass'n of St. Elec. Ry. etc., Employees v. Missouri, 374 U.S. 74, 83 S.Ct. 541, 9 L.Ed.2d 509 (1963); cf. Guss v. Utah Labor Board, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957).[11] North Carolina law is thus applicable only if Randolph and Tri-County are within the section 2(2) exemption of the National Labor Relations Act. The argument therefore merely begs the question.[12]
 
 
 21
 Urging that they are truly 'political subdivisions,' Randolph and Tri-County further show that upon dissolution their assets would revert to the state.[13] This contingency is too remote to the entitled to controlling significance and cannot outweigh all of the evidence upon which the Board concluded that Randolph and Tri-County are not 'political subdivisions.'
 
 
 22
 For these reasons, we are of the firm opinion that there was ample support in fact and in law for the Board's order. It will therefore be.
 
 
 23
 Enforced.
 
 
 
 [1]
 General Statutes of North Carolina, Ch. 117, Art. 2, 6 et seq. (Public Laws of 1935, Ch. 291 as amended)
 
 
 [2]
 7 U.S.C.A. 901 et seq. (1964)
 
 
 [3]
 Section 2(2) of the Act provides:
 '(2) The term 'employer' * * * shall not include * * * any State or political subdivision thereof, * * *.'
 
 
 [4]
 15 U.S.C.A. 607 (1963). The meaning of the term 'real property' as used in that statute is to be determined by state law. See RFC v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946), discussed at n. 6, infra
 
 
 [5]
 18 U.S.C.A. 13 (1950), which provides that acts or omissions performed or omitted on a federal reservation which are not otherwise punishable by federal law are federal crimes if punishable under the law of the state in which the reservation is located
 
 
 [6]
 The Board's opinion to the contrary in New Bedford, Wood's Hole, Martha's Vineyard, etc. Steamship Authority, 127 N.L.R.B. 1322 (1960), rests on a misconception of RFC v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946), on which it placed heavy reliance. That case held that the meaning of the term 'real property' as used in section 10 of the Reconstruction Finance Corporation Act, which authorizes state taxation of real property owned by subsidiary corporations of the Reconstruction Finance Corporation, is to be determined by state law. The Supreme Court reasoned that the usual assumption that Congress intends to have its laws operate with national uniformity was inapplicable, since by permitting local taxation of real property, Congress made national uniformity impossible. The Supreme Court held that in that instance the congressional purpose could be accomplished only by applying settled state rules as to what constitutes 'real property.'
 Because the purpose of Congress in enacting the National Labor Relations Act was to deal with national problems (National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 123, 64 S.Ct. 851, 88 L.Ed. 1170, (1944)), the Board in New Bedford was in error in applying the holding but not the ratio decidendi of Beaver County.
 
 
 [7]
 The Board has long required the existence of at least one of these two factors for the section 2(2) exemption to be applicable. See Mobile Steamship Assn., 8 N.L.R.B. 1297 (1938); Oxnard Harbor District, 34 N.L.R.B. 1285 (1941); New Jersey Turnpike Authority, 2-RC-2245, April 16, 1954, reported unofficially at 33 L.R.R.M. 1528; and New Bedford, Wood's Hole, Martha's Vineyard, etc. Steamship Authority, 127 N.L.R.B. 1322 (1960)
 
 
 [8]
 Tishomingo County Electric Power Assn., 74 N.L.R.B. 864 (Mississippi, 1947); Buckeye Electric Cooperative, Inc., 88 N.L.R.B. 196 (Ohio, 1950); Cherokee County Rural Electric Cooperative Assn., 92 N.L.R.B. 1181 (Iowa, 1951); Plymouth Electric Cooperative, 92 N.L.R.B. 1183 (Iowa, 1951); Black River Electric Cooperative, 98 N.L.R.B. 539 (Missouri, 1952); Wheatland Electric Cooperative, Inc., 94 N.L.R.B. 109 (Kansas, 1951), 102 N.L.R.B. 119 (1953), enforced, 208 F.2d 878 (10th Cir. 1953), cert. denied, 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108 (1954); Cullman Electric Cooperative, Inc., 99 N.L.R.B. 753 (Alabama, 1953); Farmers Electric Cooperative, Inc., 100 N.L.R.B. 746 (Texas, 1952); Southern Pine Electric Cooperative, 104 N.L.R.B. 834 (Alabama, 1953), enforced, 218 F.2d 824 (5th Cir. 1955), cert. denied, 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741 (1955); Sioux Valley Empire Electric Assn., 122 N.L.R.B. 92 (South Dakota, 1958); Guernsey-Muskingum Electric Cooperative, Inc., 124 N.L.R.B. 818 (Ohio, 1959), enforced, 285 F.2d 8 (6th Cir. 1960); Satilla Rural Electric Membership Corp., 129 N.L.R.B. 1084 (Georgia, 1960), 137 N.L.R.B. 387 (1962), enforced, 322 F.2d 251 (5th Cir. 1963); Craig-Botetourt Electric Cooperative, 144 N.L.R.B. 355 (Virginia, 1963), enforced, 337 F.2d 374 (4th Cir. 1964)
 In these cases the Board has consistently applied the rule that, for purposes of the National Labor Relations Act, rural electric cooperatives shall be treated as public utilities, and it has exercised its jurisdiction over all such cooperatives as meet the Board's jurisdictional standards. Since Sioux Valley, supra, the jurisdictional standard has been a gross volume of business of at least $250,000.00 per annum.
 In none of these cases, however, did the Board deal with the issue of whether these rural electric cooperatives are 'political subdivisions' within section 2(2).
 
 
 [9]
 In 1942, the Internal Revenue Service rejected Randolph's claim to exemption from employment taxes under the Social Security Act made on the ground that it is a 'political subdivision.' D. v. L. 5785, A & C: RR: 2-PAM. In 1957, Internal Revenue ruled that North Carolina electric membership corporations come within the scope of the exemption from certain federal excise taxes provided for states or political subdivisions thereof. Int.Rev.Bull., Cum.Bull., 1957-1, p. 364; Rev.Rul. 57-193. Then on March 10, 1961, it ruled that Randolph was not subject to federal income taxation as an 'instrumentality of the State of North Carolina.'
 
 
 [10]
 General Statutes of North Carolina, Ch. 95, Art. 12, 97 (Public Laws of 1959, Ch. 742), prohibits any 'employee' of the state of North Carolina or its instrumentalities from becoming a member of a labor union. Section 98 of that chapter declares that collective bargaining agreements between 'units of government' and labor unions acting as bargaining agents for such 'employees,' are against the public policy of the state, illegal and void. Section 99 declares that any violation of Article 12 is a misdemeanor
 
 
 [11]
 Cf. Amalgamated Association of Street Electric Ry. & Motor Coach Employees of America v. Dade County, 157 So.2d 176 (Fla.Dist.Ct.App.3d Dist.1963), cert. denied, U.S. (1965), 33 U.S.L. Week 3245 (Jan. 19, 1965), holding that a substantially public-owned transit system is exempt from the National Labor Relations Act by the terms of section 2(2), and thus subject to the Florida statute which bars it from collective bargaining with its employees
 
 
 [12]
 Moreover, Article 12 defines the terms 'employee' and 'employees' as 'any regular and full-time employee engaged exclusively in law enforcement or fire protection activity.' Because the employees of Randolph and Tri-County are not engaged exclusively in these activities, Article 12 appears inapplicable
 
 
 [13]
 Section 117-24 of the North Carolina Electric Membership Corporation Act provides:
 'Dissolution.-- * * * Any assets remaining after all liabilities or obligations of the corporation have been satisfied or discharged shall pass to and become the property of the State.'