**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**SCOTT PAPER COMPANY, Respondent.**

No. 7685.

United States Court of Appeals,
First Circuit.

March 31, 1971.

Charles N. Steele, Atty., Washington, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Benjamin E. Goldman, Atty., were on brief, for petitioner.

Duane R. Batista, Boston, Mass., with whom John J. Delaney, Jr., Murray S. Freeman, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This petition for enforcement of an order of the National Labor Relations Board places in issue the Board's certification of the Union,[1] as the exclusive bargaining representative of woodsmen employed by the Scott Paper Company in Maine. The unit includes hourly-paid workers in the mechanized operation, whose status as employees is not here in dispute, and three-man Canadian crews, paid on a piece-work basis, who fell, top, limb and buck the trees and then haul them by tractor to a pick-up area. Forty-two of the sixty-two tractors, leased to Scott, also on a piece-work basis, are operated by their owners. The Company claimed before the Board that these tractor owner-operators were "supervisors" within section 2(11) of the National Labor Relations Act and thus should be excluded from the bargaining unit. The Board concluded, however, that, although these individuals were primary recruiting agents of the Company, they were nonetheless "employees" within the scope of the Act. The Board-directed election resulted in a Union success. The Company, challenging the underlying certification, refused to bargain with the victor and was subsequently held by the Board to have committed an unfair labor practice, 180 NLRB No. 115. The Board presently seeks to enforce its order requiring the Company to bargain with the Union.

The tractor-owners and cutters on the three-man crews are composed almost entirely of Canadian woodsmen who are working for the Company under a temporary bond, pursuant to the provisions of § 101(a) (15) (H) (ii) of the Immigration Act of 1952, 8 U.S.C. § 1101, set out in the margin.[2] The threshold issue[3] in this application involves a determination of the compatibility of the Immigration Laws and Labor Department Regula-

---

1. Teamsters, Chauffeurs, Warehousemen and Helpers, Local 340.

2. "The term 'immigrant' means every alien, except an alien * * * who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country."

3. We pass with only brief mention another comprehensive contention, namely, that woodsmen are "agricultural workers" expressly exempted from the Act. This conclusion is contrary to the uniform case law on the question, cf. N.L.R.B. v. Gass, 377 F.2d 438, 444 (1st Cir. 1969); Sweetlake Land and Oil Co. v. N.L.R.B., 334 F.2d 220 (5th Cir. 1964), cert. de-

tions governing "bonded workers", 20 C.F.R. § 602.10, with the instruments of national labor policy, free collective bargaining and the right to strike. It is the Board's position that the applicable regulations pronounce merely minimum standards, analogous to such legislation as the Fair Labor Standards Act, and are designed "to protect domestic labor from the erosion of its standards by competition from imported labor which might be willing to work at lower standards".

The Company makes two kinds of arguments. It first portrays a parade of anomalies if collective bargaining is engrafted upon Scott's woods operations involving bonded Canadians. But it seems to us that anomalies are inherent in this employment situation and they are not exacerbated by the prospect of collective bargaining. Scott says that the right to strike would be meaningless if upon its exercise the Canadians were to be deported; but, assuming that deportation could be invoked during a work stoppage, they would face the same fate if their American co-workers in the integrated manufacturing operation exercised their protected right. The same comment applies to the Company's sympathy for the Canadian who might exercise his right not to strike and find himself subject to deportation—all are forcibly in that position now if production stopped because of a strike at the mill. Scott says that if Canadians struck, they would bring operations to a halt, adversely affecting the Americans. But this ignores the facts that American members in the bargaining unit would have shared in the decision; that, if successful, a strike would in the long term inure to the advantage of all employees; and that if woodsmen's wages were to increase significantly, the jobs might well attract Americans from other areas, who would have first call on them. Scott says further that if Canadians struck, they could not, under 20 C.F.R. § 602.2(b), be replaced by other Canadians and that by hypothesis there are no Americans available; but while N.L.R.B. v. Mackay Radio, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1936), gives an employer the right to replace workers on strike, it does not go so far as to condition the right to strike on the existence of an adequate supply of replacement workers. In any case, the Company might see fit to utilize mechanized means, for which domestic workers are available, as a substitute for striking Canadian crews. Finally Scott points out the unfairness of being required to continue to supply housing to Canadians should they be on strike; but this is little different from exacting the same duty of an employer who provides housing for domestic employees. N.L.R.B. v. Williams, 195 F.2d 669 (4th Cir. 1952). In short, while we see problems inherent in extending collective bargaining to Scott's woodsmen, the problems exist independently of the creation of the new unit.

Scott's second line of argument is that the regulatory scheme applicable to bonded workers under 20 C.F.R. § 602.10a is such a detailed code that it preempts most of the subjects appropriate for collective bargaining. Under the regulations an employer in Scott's position must pay the state's "prevailing

nied, 380 U.S. 911, 85 S.Ct. 899, 13 L. Ed.2d 799 (1965) ; N.L.R.B. v. Monterey County Building and Construction Trades Council, 335 F.2d 927, 930–931 (9th Cir. 1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965), and the Fair Labor Standards Act definitions, 29 U.S.C. § 203(f), interpreted specifically in 29 C.F.R. § 780.161, made applicable to the Act since 1947 by Congress in its annual appropriation bill riders. Scott's argument is based on other definitions of "agriculture" for other pur-

poses, and the assumption that the contrary definition must be disregarded since an appropriation's rider usually restricts rather than expands an agency's jurisdiction. But to argue that the rider expands jurisdiction rather than defines it is to assume the point. We think the Board is well within its power in reading the rider as it does and that the kind of work done here, wholly integrated into a complex industrialized production process, is sensibly deemed non-agricultural.

wage", supply food, furnish lodging which meets a long list of safety and health requirements, carry minimum insurance covering death, injury, and disease, supply tools and transportation. Moreover, the traditional union goal of job security runs counter to the Immigration Act's policy of assuring that Americans displace Canadians where possible. While it is true that collective bargaining under these circumstances will face some limitations not applicable in other industries, it is not obvious that the Board exceeded its power or discretion in deeming that these workers can feasibly be brought within the protection of the national labor laws. Not only does the setting of minimum requirements not preclude bargaining about improvements, but the catalogue of possible subjects far outruns those presently dealt with in the regulations.[4]

■ "In the absence of some compelling evidence that the Board has failed to measure up to its responsibility" in determining that the employer-employee relationship is such that "the process of collective bargaining may appropriately be utilitized," N.L.R.B. v. E. C. Atkins & Co., 331 U.S. 398, 414, 67 S.Ct. 1265, 1273, 91 L.Ed. 1563 (1947), we would not overturn its considered judgment. Some seventeen years ago the Board faced this problem, noting the requirement of adhering to prevailing wages and hours, but concluding that the freedom of the employer to apply his labor policies to both Canadian and American employees, who shared the same conditions and interest, warranted the inclusion of the Canadians in the bargaining unit. Brown Co., 109 NLRB No. 173 (1954).[5] While the quantum of regulations has increased, we cannot say that the total configuration is so changed as to render the Board's decision unfounded.

■ We turn now to the other central issue of this application, the appropriateness of the Board's determination that the owner-operators of the tractors were not supervisors within section 2(11), set out in the margin.[6] We are mindful that "the gradations of authority * * * are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.'" N.L.R.B. v. Swift & Co., 292 F.2d 561, 563 (1st Cir. 1961). However, the Board's determination in these matters is not unreviewable; its finding will only be approved by this court if it is supported by substantial evidence on the record considered as a whole. N.L.R.B. v. Magnesium Cast-

4. While we do not intimate that all of the following are either feasible or proper, a partial list of possible subjects for collective bargaining might include: (1) working conditions; (2) work loads; (3) work assignments; (4) promotion; (5) merit increases; (6) technological changes; (7) seniority; (8) tenure; (9) grievance procedure; (10) discipline; (11) transfer; (12) job preference; (13) pensions; (14) arbitration; (15) sub-contracting; (16) no-strike clause; (17) union status; (18) lay-offs; (19) rehiring.

5. Decided the same day and involving the same issue were Nadeau Lumber Co., 109 NLRB No. 171 (1954), and Paris Mfg. Co., 109 NLRB No. 172 (1954). In Brown the Board quite properly distinguished Stokely Van Camp, 107 NLRB No. 1137 (1954), where no part of an employment contract, covering in great detail the terms and conditions of employment, could be altered without the consent of both the United States and the country of origin of the temporary worker.

6. Section 2(11) of the Act defines the term supervisor as
"* * * any individual having the authority, in the interest of the employer, to hire, transfer, assign, suspend, lay-off, recall, promote, discharge, assign, reward or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

ing Co., 427 F.2d 114, 117 (1st Cir. 1970), aff'd, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); N.L.R.B. v. Metropolitan Life Insurance Co., 405 F. 2d 1169, 1173 (2d Cir. 1968).

The Board's decision recognized the role played by the owner-operators in the recruitment process of the Company. It discounted the importance of this power because (1) it is exercised by ordinary cutters as well; (2) it is conditioned upon formal hiring approval by the Company foreman; and (3) it is based on the owner-operator's self-interest in insuring harmonious relations among the crew.[7] The Board's decision, however, makes no mention of the functional power of these owner-operators to fire crew members, a factor which alone would be sufficient to require a characterization of the employee in question as a "supervisor". Cf. N.L.R.B. v. Leland-Gifford, 200 F.2d 620 (1st Cir. 1952). Scott moved for reconsideration of the Board's Decision and Direction of Election on the ground that the record contained clear evidence of the tractor owner-operators' power to fire cutters, citing testimony of the management witnesses. The Board denied the motion "as it presents nothing not previously considered".

The state of the evidence was as follows. Three of Scott's witnesses, the General Woods Superintendent and two camp foremen, testified that while Scott's foremen would on occasion discharge an employee for drunkenness or breach of safety rules, the foremen would make complaints as to quantity or quality of production only to the tractor owner-operator, whom they considered the leader of the crew. In many cases a word to the wise was sufficient. If not, crew changes would take place at the instigation of the tractor owner-operator. Foremen would never discharge a cutter for reasons of faulty production; the exercise of this responsibility was left entirely to the tractor owner-operators' discretion. On occasion the tractor owner-operator would inform the foreman that he intended to terminate a particular cutter, but more often the discharge and replacement with a new cutter would occur without the foreman's prior knowledge. The foreman was then informed of the termination so that the Company's formal records could be updated. There was also extensive testimony as to the investment and remuneration of the tractor owner-operators.[8]

The Union's witnesses were two tractor owner-operators. One Lessard was never examined as to his experience or observations relating to the practice or power of discharging a cutter. The other, one Bougie, testified that, although he never had experienced an inefficient crew member, if a cutter failed to keep

---

7. We have some difficulty with the Board's conclusion on this point in the light of its own observation that the tractor owner "in most instances" serves as the recruiting agent. This would seem to come close to a power "effectively to recommend" hiring. But this is one of those close decisions in which we must accept the Board's judgment. Magnesium Casting, *supra*, 427 F.2d at 118.

8. The investment in tractor owner-operator's equipment averaged $7500 and his remuneration was computed on two bases; he would share one-third of the payment for labor, computed on a piece-work basis, and in addition he would receive an amount for rental of his equipment, computed by multiplying a rate per cord of wood by the number of cords cut by the crew. He would also receive a third share of a small chain saw allowance, determined by applying a rate to total cords produced. In one case analyzed in detail, the tractor owner-operator's total payment for a week was $278.74, compared to $146.64 for labor paid a cutter. It is obvious that, were a crew to be one man short, the tractor owner-operator would not suffer in the amount he received for his labor but would suffer in that he would receive at best only two-thirds of the amount he could expect for use of his equipment if a full three-man crew were working. To the extent that one or both cutters were not producing well, both his labor payment and payment for his equipment would be diminished. He had roughly twice as much economic interest in an efficient operation as either cutter, who shared only in the labor payment.

pace, one of two things would happen: the two cutters would talk about the problem and one would leave; or one cutter might complain to the camp foreman or his assistant. Bougie said that he knew that a man had left after such a complaint was made. Such a problem, according to Bougie, was more of a problem for the more efficient cutter than for the tractor owner-operator.

This is the sum total of the testimony as to the power to discharge for work of poor quality or insufficient volume. The Hearing Officer and the Board, of course, have a right to credit the testimony of one Union witness and discredit the testimony of three management witnesses as to what they have allegedly observed or experienced. There is no indication in their opinions, however, that this right was exercised. Nowhere do the opinions imply less than full belief in management's testimony, particularly as to the power of discharge. Management's testimony was demonstrably supported by the objective, undisputed fact of a heavy investment on the part of the tractor owner-operator in equipment which is rented and paid for on the basis of cords of wood produced by the crew. The Union's witness, on the other hand, spoke not from personal experience, but went on to testify that the tractor owner-operator, despite his double interest in the crew's productivity, was less interested in a cutter's performance than was another cutter, a conclusion that strikes us as inherently at odds with economic realities. On the record as a whole, we cannot say that this amounted to "substantial evidence" that the tractor owner-operator had no effective authority to discharge employees.

It is clear that the owner-operators in exercising the power to discharge used independent judgment as required by section 2(11). N.L.R.B. v. Brown &

Sharpe Mfg. Co., 169 F.2d 331 (1st Cir. 1947). The Board in its Decision and Direction of Election was silent on this issue. Counsel for the Board in brief and at argument advanced the proposition that although there may be such a power to terminate employment, this does not constitute a power to discharge in the interest of the employer. While we doubt that the Board would have charted such a course, it is clear that counsel's attempt at salvage comes too late. N.L.R.B. v. Metroplitan Life Ins. Co., 380 U.S. 438, 443–444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). In any case, we consider the distinction medievally theological. Both the Company and the tractor owner-operator have the same interest, backed by their separate investments to be sure, in maximizing production. We are unable to distinguish Deaton Truck Lines, 143 NLRB No. 1372 (1963), enf'd, 337 F.2d 697 (5th Cir. 1964), in which the interests of both the company and the truck owners were so intertwined that the powers were exercised for both.

The tractor owner-operator is in a position of extraordinary power. In a union of several hundred employees, with a high rate of turnover, the potential influence of forty-two owner-operators with at least substantial influence in recruiting and, as we see it, absolute power to discharge, is inconsistent with the democratic presupposition underlying a collective bargaining unit. Cf. N. L.R.B. v. Metropolitan Life Ins. Co., supra 405 F.2d at 1178 (2d Cir. 1968).

For this reason the Board's order cannot be enforced and the certification of the Union, as presently constituted, cannot stand.[9]

The petition of the Board to enforce its order is denied and the cause is remanded to the Board for action consistent with this opinion.

9. Because of this disposition and the necessity of a new election, we do not consider whether the Board correctly ruled that twenty-nine tenured employees who had been laid off were ineligible to vote since the Company had not shown that they had any reasonable expectation of resuming employment.