808 F.2d 526
 124 L.R.R.M. (BNA) 2001, 55 USLW 2350,
105 Lab.Cas. P 12,122
 STATE BANK OF INDIA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
STATE BANK OF INDIA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Local 6, International Federation of Health Professionals,
AFL-CIO, Intervening Party Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
STATE BANK OF INDIA, Respondent.
 Nos. 85-1028, 85-1029, 85-1585 and 85-1586.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 19, 1986.
Decided Dec. 11, 1986.
 
 John Gibbons, Kelley, Drye & Warren, New York City, for petitioner.
 Victoria Higman, National Labor Relations Bd., Washington D.C., for respondent.
 Before CUMMINGS, COFFEY, Circuit Judges, and WILL, Senior District Judge.*
 COFFEY, Circuit Judge.
 
 
 1
 The State Bank of India ("State Bank" or "Bank") petitions for review of two orders of the National Labor Relations Board ("Board" or "NLRB") finding that the Bank committed unfair labor practices in refusing to bargain with Local 6, International Federation of Health Professionals ("Union"), in violation of sections 8(a)(1) and (5) of the National Labor Relations Act ("Act" or "NLRA"), 29 U.S.C. Sec. 158(a)(1) and Sec. 158(a)(5). The Board cross-petitions for enforcement of its orders.
 
 
 2
 The Bank contests the Board's orders on four grounds. Initially, the Bank argues that because it is "a direct instrumentality of the Indian Government," it is not considered as an "employer" within the parameters of Sec. 2(2) of the National Labor Relations Act, 29 U.S.C. Sec. 152(2), even though it does business in this country. Next, the Bank argues that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. Sec. 1330, Sec. 1602 et seq. immunizes the Bank from the Board's jurisdiction. The Bank argues in the alternative that the NLRB exercise of jurisdiction over it conflicts with prior NLRB's decisions declining to exercise jurisdiction over commercial concerns owned by foreign governments and thus an abuse of discretion by the NLRB. Finally, the Bank insists that the NLRB should have granted the Bank a hearing on the Bank's objections to the representation election conducted on September 2, 1982 at the Bank's New York branch office. We enforce the orders of the NLRB.
 
 
 3
 On July 14, 1982 the Union petitioned the NLRB for a representation election at the State Bank's New York branch, seeking to represent full-time and regular part-time tellers, clerks, clerk-typists, messengers, bookkeepers, receptionists, secretaries and machine operators. Pursuant to a "stipulation for certification upon consent election,"[1] and the Board conducted an election on September 2, 1982. The Union prevailed in the election with a majority of nine votes or forty-three to thirty-four.
 
 
 4
 The State Bank filed timely objections to the election, arguing that "the laboratory conditions necessary for a free and fair election were destroyed" because: (1) the Union or employees supporting the Union distributed to the eligible voters a forged letter dated August 30, 1982, signed by the Deputy Chief Manager of the State Bank, Mr. P.K. Bhattacharjee, that could have misled voters into believing that Bhattacharjee encouraged the employees to vote in favor of union representation; (2) the Union or its supporters on two occasions marked an "X" on the "yes" box of the sample ballot portion of an official NLRB notice of election posted in an employee lunchroom, suggesting to the voters that the NLRB favored unionization; and (3) the Union, in an effort to persuade employees to vote "Union," distributed a letter to employees that included an inflammatory racial statement that the State Bank, "tr(ied) to keep depressing conditions and low wages for its employees, because most of you are of Indian nationality and other minority groups."[2]
 
 
 5
 On October 15, 1982, after investigating the State Bank's objections and receiving evidence from the parties, the NLRB Regional Director recommended that the objections of State Bank be "overruled" and that the Board issue a "certification of [bargaining] representative." The Regional Director declined to hold a hearing to resolve factual issues because, in his view, even if the evidence offered by the Bank to support its three objections were "deemed to be true ... no substantial and material factual issues exist." With respect to the forged letter from the company (objection 1) and the twice-altered official NLRB notice of election (objection 2), the Regional Director concluded that the Bank's evidence was insufficient as a matter of law to hold the Union responsible. The Regional Director concluded that the State Bank's third objection, concerning the allegedly racially inflammatory statement, was meritless as a matter of law because the text of the letter, "although racially oriented, does not evince the prohibited motive of inflaming racial hatred merely to obtain votes.... Rather, [the] message to employees appears to be a permissible attempt to encourage racial pride and concerted action by minority group employees to better their wages and working conditions."
 
 
 6
 The Bank filed exceptions to the Regional Director's recommendation, arguing that the Regional Director erred in not holding a hearing and in overruling the Bank's objections. On February 23, 1983, the Board issued a decision adopting the Regional Director's recommendation and certifying the Union as the exclusive bargaining agent for the Bank's clerical employees.[3]
 
 
 7
 Subsequently, the State Bank refused the Union's request to bargain and on April 28, 1983, unilaterally awarded a retroactive wage increase to the State Bank non-managerial employees. Pursuant to the Union's charges filed with the NLRB, the NLRB's Regional Director issued two complaints alleging that the State Bank had violated sections 8(a)(5) and 8(a)(1) of the Act in refusing to bargain with the Union and in unilaterally granting a wage increase.[4] The State Bank admitted in its answer that it had refused to bargain but contested the NLRB's certification of the Union.[5] The NLRB issued two decisions and orders ruling that the State Bank had committed violations of sections 8(a)(5) and (1) of the Act in refusing to bargain with the Union, 273 NLRB No. 38, and in unilaterally conferring a wage increase on State Bank non-managerial employees. 273 NLRB No. 39. The Board ordered the State Bank to cease and desist from these practices, and to bargain with the Union. The Bank petitioned for review[6] requesting that we set aside the two NLRB orders arguing: (1) that the NLRB lacks statutory jurisdiction over the State Bank because the State Bank is a "direct instrumentality of the Indian Government" and therefore is not an "employer" within the meaning of the NLRA, Sec. 2(2), 29 U.S.C. Sec. 152(2); (2) that the State Bank is immune from NLRB jurisdiction as an instrumentality of the government of India under the Foreign Sovereign Immunities Act, 28 U.S.C. Secs. 1330, 1602 et seq.; (3) or, in the alternative, that the NLRB abused its discretion in exercising jurisdiction over the State Bank because the Board overruled its prior decisions declining to exercise jurisdiction over instrumentalities of foreign governments doing business in this country; and (4) that the Regional Director must hold an evidentiary hearing on the State Bank's objections to the election and "certification of representative."
 
 II
 
 8
 A. The State Bank as an "employer" within Sec. 2(2) of the NLRA.
 
 
 9
 The State Bank asserts that as "a direct instrumentality of the Indian government" the NLRA impliedly excludes it from the jurisdiction of the NLRB.[7] The State Bank of India was nationalized and incorporated in India by the State Bank of India Act of 1955. The Reserve Bank of India, a wholly-owned and controlled agency of the Indian Government, owns more than 92% of the stock in the State Bank of India. The State Bank acts as an agent for the Reserve Bank of India in locations where the Reserve Bank is not established. Petitioner State Bank fails to explain how this agency relationship between itself and the Reserve Bank of India distinguishes it from American banks similarly obligated to the American Federal Reserve Bank, nor how this relationship sets the State Bank apart from any other foreign-owned commercial entity doing business in the United States. Although the American branches of the State Bank of India have assisted the Reserve Bank of India and the government of India in obtaining loans, making investments, buying and selling foreign currency, and financing food purchases, the State Bank performs the same services as the typical American bank and nothing in the record establishes that these operations serve to distinguish these American branches from any other bank operating in this country.
 
 
 10
 Nor do the regular operations of the State Bank or its internal organization distinguish the State Bank from American banks. The Bank maintains branch offices in New York and Chicago, as well as an agency in Los Angeles. The branch offices offer general banking services to the public, including checking and savings accounts, commercial loans, letters of credit and foreign currency exchange. In the United States, the Bank is subject to federal and state banking regulations and taxes, the Bank's deposits are insured by the Federal Deposit Insurance Corporation, and the Bank's foreign employees work in the United States subject to United States immigration law.
 
 
 11
 The upper level management of the United States branch offices of the State Bank (e.g., manager, assistant manager, accountant) are assigned to their employment positions in the United States from India on a temporary basis. The State Bank hires all other U.S. branch employees, including those represented by the union, locally. Although the International Division of the State Bank in Bombay, India, makes all policy decisions concerning the foreign operations of the Bank, the local branch managers are responsible for day-to-day operations and local personnel decisions including the hiring and firing of employees. He also makes recommendations to the State Bank's International Division in Bombay, India concerning the hours of operation of the American branches, the fringe benefits for employees, staffing levels, conditions of employment, and matters typically the subject of employment contracts. We are told that these recommendations of the local branch managers concerning the operation of the Bank's branches in America are given great weight by the State Bank's International Division.
 
 
 12
 According to the State Bank, the import of Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), and McCulloch v. Sociedad Nacional de Marineros, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), is that "the Board should not tread in the sensitive area of foreign relations ... by exercising jurisdiction that would have extra-territorial effects without a clear Congressional mandate." The Bank further maintains that by creating an exception to the definition of the term "employer" in the Act for "the United States or any wholly-owned government corporation, or any Federal Reserve Bank, or any state or political subdivision thereof...." Congress "expressed its preference that the agencies with expertise in monetary policy be free from interference by the Board, which has no expertise in that critical area. This rationale applies even more forcefully to the Bank, which is an instrumentality of a foreign government, as well as an agent for the Reserve Bank of India."
 
 
 13
 The Supreme Court "has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the National Labor Relations Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause." N.L.R.B. v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (emphasis in original); N.L.R.B. v. Mars Sales and Equipt. Co., 626 F.2d 567, 575 (7th Cir.1980). The language of the NLRA Sec. 2(2) on its face clearly vests jurisdiction in the Board over "any" employer doing business in this country save those Congress excepted with careful particularity.[8]
 
 
 14
 "As in all cases of statutory construction, our task is to interpret the words ... in light of the purposes Congress sought to serve." Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). These purposes are stated in relevant part in the "Findings and Declaration of Policy" in Sec. 1 of the NLRA, 29 U.S.C. Sec. 151:
 
 
 15
 "Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."
 
 
 19
 Congress created the National Labor Relations Board to carry out these policies, and to implement them in a manner consistent with preserving interstate commerce and equality of bargaining power. Accordingly, "the Board has the duty of determining in the first instance (the jurisdiction) of the National Labor Relations Board and that the Board's determination must be accepted by reviewing courts if it has a reasonable basis in the evidence and is not inconsistent with the law." N.L.R.B. v. E.C. Atkins & Co., 331 U.S. 398, 403, 67 S.Ct. 1265, 1268, 91 L.Ed. 1563 (1947). As the Supreme Court stated in upholding the NLRB's jurisdiction over illegal aliens as "employees" under NLRA Sec. 2(3), "[s]ince the task of defining the term ... is one that 'has been assigned primarily to the agency created by Congress to administer the Act' ... the Board's construction of that term is entitled to considerable deference, and we will uphold any interpretation that is reasonably defensible." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 104 S.Ct. 2803, 2808-09, 81 L.Ed.2d 732 (1984).
 
 
 20
 In this case, the Board held that because the State Bank failed to establish that it fell within one of the exceptions specifically articulated in Sec. 2(2), expressio unius est exclusio alterius placed the State Bank squarely within the NLRB jurisdiction. The Board's position is that the NLRA has granted it plenary jurisdiction with specific, narrow exceptions, and thus its position that Congress intended all employers to be subject to the NLRA, has been repeatedly upheld in the courts.
 
 
 21
 In NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 499-504, 99 S.Ct. 1313, 1318-21, 59 L.Ed.2d 533 (1979), the Court excluded from the NLRA's jurisdiction under Sec. 2(2) schools operated by the Catholic Church even though the religiously affiliated schools were not specifically excepted by the Act because "serious constitutional questions" would arise if the NLRA were construed to include church schools. Following the rule of statutory construction that "an Act of Congress ought not to be construed to violate the Constitution if any other possible construction remains available," Id., the Court found that "[t]he absence of an 'affirmative intention of Congress clearly expressed' fortifies our conclusion that Congress did not contemplate that the Board would require church-operated schools to grant recognition to Unions as bargaining agents for their teachers." 440 U.S. at 506, 99 S.Ct. at 1322.
 
 
 22
 Far from supporting State Bank's arguments, Catholic Bishop of Chicago, 440 U.S. at 506, 99 S.Ct. at 1322, affirms the NLRB's position that NLRA jurisdiction extends to "any " employers doing business in this country except those specifically excluded unless such a construction would violate the Constitution. The majority in Catholic Bishop did not conclude that there were exceptions to the employers covered by the NLRA other than those expressly excepted by Congress. The majority merely determined that since it is a settled rule of statutory construction and reasonable that an unconstitutional intent or expression will not be inferred from congressional silence, the courts must construe the NLRA to exclude any employer whose inclusion within the NLRA would violate the constitution.
 
 
 23
 The State Bank does not argue that it is a constitutionally problematic employer within the meaning of Catholic Bishop. Instead, it relies on another line of cases in which the Supreme Court has required an affirmative expression by Congress that a class of employers falls under the jurisdiction of the NLRB before the Court will agree that the NLRB possesses jurisdiction over that class of employers. In Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), American unions supported and participated in picketing that followed a labor dispute that erupted while the flag ship of a foreign employer was temporarily docked in a United States port. The foreign ship operated with a foreign crew employed under a labor agreement negotiated pursuant to the laws of another country. The Supreme Court explained that although Congress could have included foreign employers operating ships temporarily docked in United States waters within the jurisdiction of the NLRA:
 
 
 24
 "It is beyond question that a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country. Wildenhus's Case, 120 U.S. 1 [7 S.Ct. 385, 30 L.Ed. 565] (1887). The exercise of that jurisdiction is not mandatory but discretionary. Often, because of public policy or for other reasons, the local sovereign may exert only limited jurisdiction and sometimes none at all. Cunard S.S. Co. v. Mellon, 262 U.S. 100 [43 S.Ct. 504, 67 L.Ed. 894] (1923). It follows that if Congress had so chosen, it could have made the Act applicable to wage disputes arising on foreign vessels between nationals of other countries when the vessel comes within our territorial waters. The question here therefore narrows to one of intent of the Congress as to the coverage of the Act.
 
 
 25
 The parties point to nothing in the Act itself or its legislative history that indicates in any way that the Congress intended to bring such disputes within the coverage of the Act.... Our study of the Act [NLRA] leaves us convinced that Congress did not fashion it to resolve labor disputes between nationals of other countries operating ships under foreign laws."
 
 
 26
 353 U.S. at 142, 143, 77 S.Ct. at 701-02 (footnote omitted) (emphasis added).
 
 
 27
 In McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), an American union petitioned for an election among the foreign crew members of a foreign-flag ship doing regular business with the United States. The foreign crewmen were previously certified and union-represented under foreign labor law. The Court followed its decision in Benz, holding that since there was no affirmative expression in the NLRA or its legislative history that Congress intended the NLRB to have jurisdiction over foreign crews on foreign ships temporarily docked in American ports, the NLRB was without authority to order a representation election for the foreign crew on a foreign ship. The Court explained that the Board's assertion of jurisdiction over "foreign seamen aboard vessels under foreign flags has aroused vigorous protests from foreign governments and created international problems for our Government." 372 U.S. at 16-17, 83 S.Ct. at 674-75. The Court noted that "the Board's assertion of power to determine the representation of foreign seamen aboard vessels under foreign flags has aroused vigorous protests from foreign governments and created international problems for our Government." Id.
 
 
 28
 In contrast to the foreign employers of foreign crewmen involved in Benz and McCulloch, the record establishes that State Bank is doing business in the United States and in fact has made it clear that they intend to expand their market share in this country. The Bank has plans to expand its operations in the United States. Further, unlike the foreign employees in Benz and McCulloch who were only temporarily located in the United States, most of State Bank's employees in its United States offices are American citizens or American residents awaiting naturalization.[9] Because these employees live and work in the United States and are subject to the obligations and responsibilities of American citizens, they are at the same time entitled to the protections and benefits our nation provides through its laws. For example, these resident employees of the State Bank would be eligible for Social Security benefits at age sixty-five under 42 U.S.C. Sec. 1382c(a)(1).
 
 
 29
 State Bank's employees are more appropriately compared to the American employees involved in International Longshoremen's Local 1416, AFL-CIO v. Ariadne Shipping Co., 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970), where the Supreme Court held that American residents who were employed by a foreign flag ship to do longshoreman's work were covered by the NLRA. The Court distinguished Benz and McCulloch, writing:
 
 
 30
 "The considerations that informed the Court's construction of the statute in the cases above are clearly inapplicable to the situation presented here. The participation of some crew members in the longshore work does not obscure the fact that this dispute centered on the wages to be paid American residents, who were employed by each foreign ship not to serve as members of its crew but rather to do casual longshore work. There is no evidence that these occasional workers were involved in any internal affairs of either ship which would be governed by foreign law. They were American residents, hired to work exclusively on American docks as longshoremen, not as seamen on respondents' vessels."
 
 
 31
 397 U.S. at 199-200, 90 S.Ct. at 874 (footnote omitted). In the present case as well, the labor dispute centers on the wages to be paid American residents, foreign or natural, who do non-managerial work for a foreign concern engaged in a commercial enterprise in this country. "The longstanding tradition of restraint in applying the laws of this country to ships of a foreign country--a tradition that lies at the heart of Benz and every subsequent decision--therefore is irrelevant to this case." International Longshoremen's Association, AFL-CIO v. Allied International, Inc., 456 U.S. 212, 221, 102 S.Ct. 1656, 1662, 72 L.Ed.2d 21 (1982).
 
 
 32
 The State Bank contends that because it is a "direct instrumentality of the Indian Government," exercise of jurisdiction by the NLRB "threatens to cause extraterritorial effects ... completely disruptive of the international monetary policy carried out by the Bank as an instrumentality of the Indian Government (which) could provoke retaliatory action by the Indian Government." We do not believe that the Bank's speculative, and undocumented assertions of a disruption in our foreign relations with the government of India come close to demonstrating the kind of international conflict that would bar NLRB jurisdiction. The State Bank while doing business in this country is subject to our Federal and State banking laws directly dealing with its banking functions while acting as an agent of the Indian Government. The State Bank has offered no evidence to establish that allowing its American resident employees to unionize will interfere with its obligations to the Reserve Bank of India or disrupt the international monetary policy of the Indian government. While it is true that the NLRA exempts the United States federal reserve banks from its jurisdiction, the State Bank is not itself a reserve bank but rather a bank that acts on occasion as the agent of a foreign reserve bank.
 
 
 33
 Thus, the Bank's argument amounts to nothing more than a request that we allow it to compete in this country against United States banks that are subject to the NLRA at the expense of the nationally-mandated rights and privileges of American resident workers and reap the benefits of doing business in this country, merely because it occasionally acts as an agent of the Reserve Bank of India and is owned by the Reserve Bank. The NLRA and its legislative history clearly establish that Congress did not intend to exempt from NLRA jurisdiction a foreign enterprise with substantial commercial operations in this country and employing American residents merely because the enterprise is connected with a foreign government. Therefore, we agree with the NLRB's determination that the State Bank of India is an "employer" for purposes of the NLRA.
 
 
 34
 B. Immunity Under the Foreign Sovereign Immunities Act.
 
 
 35
 The Foreign Sovereign Immunities Act ("FSIA")[10] "codifies, as a matter of federal law, the restrictive theory of sovereign immunity." Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). This restrictive theory of sovereign immunity is encapsulated in an oft-quoted statement of Chief Justice Marshall:"The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself."
 
 
 36
 The Schooner Exchange v. M'Faddon, 7 Cranch 116, 135, 3 L.Ed. 287 (1812).
 
 
 37
 The State Bank argues that the Foreign Sovereign Immunities Act precludes the NLRB from asserting jurisdiction over it. Thus, we must determine whether Congress intended that the FSIA immunize the State Bank of India from that portion of the United States' "necessarily exclusive and absolute" jurisdiction over employers doing business in this country that Congress vested in the NLRB.
 
 
 38
 On its face, the FSIA limits the jurisdiction of the state and federal courts, not that of the NLRB, over claims involving foreign sovereigns. The FSIA would appear to do no more than prevent the Board from seeking enforcement of its orders involving a foreign sovereign in a United States or state court. However, we need not decide the precise limits the FSIA places on NLRB jurisdiction because the commercial operations of the State Bank bring it outside the scope of the FSIA. Section 1605(a)(2) of the FSIA provides:
 
 
 39
 "(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or any of the states in any case--
 
 
 40
 * * *
 
 
 41
 * * *
 
 
 42
 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."
 
 
 43
 As defined in section 4(a) of the FSIA, "a 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or a particular transaction or act, rather than by reference to its purpose." 28 U.S.C. Sec. 1603(d). Specifically, the term "commercial activity" includes "a broad spectrum of endeavor, from an individual commercial transaction to a regular course of commercial conduct.... Certainly if an activity is customarily carried on for profit, its commercial nature could readily be assumed." H.R.Rep. No. 94-1487, 2d Sess. 16 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 6604, 6614-15. The House Report accompanying the FSIA clearly states that the employment of American citizens or third country nationals by the foreign state in the United States constitutes "commercial activity" and thus precludes immunity under the Act. Id.
 
 
 44
 In the present case, the State Bank operates branch offices in the United States furnishing the same full range of commercial banking services typically provided by American commercial banks, including checking and deposit accounts, commercial loans, letters of credit, foreign currency exchange, and time deposits.[11] The local branches of the State Bank of India employ American residents in furtherance of these commercial activities. If in fact the Bank engages in the commercial activities for the purpose of benefiting a governmental shareholder--the Reserve Bank of India--that fact is irrelevant under Sec. 1603(d) since the commercial character of an operation is to be ascertained from the nature of the activity rather than its purpose. In this case our duty is clearly laid out by the text of the statute itself:
 
 
 45
 "As to any claim for relief with respect to which a foreign state is not entitled to immunity ... the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances...."
 
 
 46
 28 U.S.C. Sec. 1606.
 
 C. Abuse of Discretion
 
 47
 The State Bank maintains that the Board's assertion of its jurisdiction over the Bank is an abuse of the Board's discretion in that the Board has on two previous occasions, declined to exercise jurisdiction in allegedly similar factual situations. In British Rail International, Inc., 163 NLRB 721 (1967), the Board declined to exercise jurisdiction over a corporation wholly-owned by an agency of the United Kingdom. The Board specifically refused to reach the question of whether the Board had statutory jurisdiction over British National Railways pursuant to the Act, but deemed it "inappropriate to assert jurisdiction in the instant proceeding." The Board cited the Supreme Court decision in McCulloch without discussion for support. In AGIP, USA, Inc., 196 NLRB 1144 (1972), the Board declined to assert jurisdiction over a corporation wholly-owned by the Italian government, again without reaching the question of whether the Board had statutory jurisdiction. In support of its decision, the Board in AGIP merely cited the British National Railways case without any discussion much less setting forth its reasoning.
 
 
 48
 In the 1977 NLRB decision when the Board initially asserted jurisdiction over the State Bank, the Board overruled BRI and AGIP. 229 NLRB at 842. After reviewing Benz and McCulloch, the Board determined that the concerns voiced by the Supreme Court in those decisions did not apply to the State Bank as "neither [Benz nor McCulloch ] dealt with the issue of foreign governments or their agents as employers doing business within the Territorial United States." Id. at 841. The Board also deemed significant the fact that foreign banks were increasingly involved in American markets, and that more American residents were being employed by those foreign banks and thus determined that circumstances had changed substantially since its earlier decisions. Reflecting on the changed circumstances and the increased employment of American residents by foreign entities, the Board wrote:
 
 
 49
 "[W]e now conclude that there is no public policy or policy of the Act which, on the ground that the employer is discolsed [sic] to be an 'agency' or 'instrumentality' of a foreign state, justifies us to continue to decline jurisdiction in cases affecting employees in our own country whose employer engages in commercial activity which meets the Board's jurisdictional standards for such enterprises.... It will better effectuate the policies of the Act for the Board to assert, rather than in our discretion decline, jurisdiction...."
 
 
 50
 Id. at 842.
 
 
 51
 The deference normally due the judgment of an administrative agency in the exercise of its discretion, see Sure-Tan, Inc. v. N.L.R.B., 467 U.S. 883, 104 S.Ct. 2803, 2808-09, 81 L.Ed.2d 732 (1984), is all the more important when we are requested to intrude upon that agency's prosecutorial discretion. Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), further restricted the scope of judicial review of agency prosecutorial decisions in articulating a presumption that the decision of an agency not to enforce and employ its regulatory authority in a particular case is unreviewable by a Court of Appeals. The Court concluded that in such cases, with narrow exceptions,[12] there is "no law to apply" for purposes of judicial review under the Administrative Procedure Act, 5 U.S.C. Sec. 701(a)(2). Although the NLRA specifically provides for judicial review of Board orders in Secs. 10(e) and 10(f), the statutory language does not specifically articulate the "law to apply" to the NLRB's decisions to assert or not assert jurisdiction. We therefore turn to case law in order that we might ascertain whether the NLRB abused its discretion in asserting jurisdiction over the State Bank.
 
 
 52
 We held in N.L.R.B. v. Austin Developmental Ctr., Inc., 606 F.2d 785, 790 (7th Cir.1979), that the Board's decision to assert jurisdiction "will not be reversed absent a showing that it acted unfairly and caused substantial prejudice to the affected employer." The Board's decision to assert jurisdiction over the State Bank in this factual situation meets this test since in deciding to assert jurisdiction over the Bank, the Board enunciated a policy equally applicable to similarly situated, foreign-government-owned employers.
 
 
 53
 Further, the Board must not announce new principles (e.g. a new assertion of jurisdiction) in an adjudicative proceeding, to the prejudice of those affected, where the failure of the agency to proceed by rule-making would constitute an abuse of discretion. See N.L.R.B. v. Wyman-Gordon Co., 394 U.S. 759, 765-66, 89 S.Ct. 1426, 1429-30, 22 L.Ed.2d 709 (1969); N.L.R.B. v. Bell Aerospace, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771-72, 40 L.Ed.2d 134 (1974). However, as Wyman-Gordon and Bell Aerospace make clear, "the Board is not precluded from announcing new principles in an adjudicative proceeding and ... the choice between rule-making and adjudication lies in the first instance within the Board's discretion." Bell Aerospace, 416 U.S. at 294, 94 S.Ct. at 1772. In Bell Aerospace the Supreme Court held that the NLRB could decide on a case-by-case basis whether buyers constituted "managerial employees" for purposes of the NLRA. In the present case, just as in Bell Aerospace, "[t]he Board ... has reason to proceed with caution, developing its standards in a case-by-case manner with attention to the specific character" of the parties before it. 416 U.S. at 294, 94 S.Ct. at 1772. Specifically, the very arguments that the State Bank of India makes--that the NLRB should tread carefully when its decisions might affect the monetary policy of a foreign nation--support the Board's choice of overruling its prior policy in an adjudication rather than a rule-making proceeding.
 
 
 54
 Finally, the NLRB's decision to shift and reverse its former policy toward employers such as the State Bank of India must necessarily be grounded in a "reasoned analysis in support of the change." Local 1384, UAW v. N.L.R.B., 756 F.2d 482, 493 (7th Cir.1985). As we wrote in Austin, the NLRB "may depart from previously established guidelines when to do so will, in the Board's judgment, effectuate the purposes of the Act." 606 F.2d at 790. "An administrative agency ... must be allowed substantial flexibility to adapt its standards to changing conditions...." Id., n. 10.
 
 
 55
 The Board specifically found that asserting jurisdiction over the State Bank would effectuate the purposes of the NLRA given the expanded commercial activities of foreign-government-owned employers like the State Bank of India in our country, and the increasing number of American resident employees hired by them. We have no basis for disagreeing with that conclusion, or the reasoning the NLRB articulated in reaching it. Indeed, that conclusion is in harmony with Congress' declaration of policy in 29 U.S.C. Sec. 151, set out above at page 531, and with the Supreme Court's opinion in Ariadne Shipping Co., supra. We therefore hold that the NLRB did not abuse its discretion in reversing prior policy and exercising jurisdiction over the State Bank.
 
 III
 
 56
 We next consider whether the Board should have granted the State Bank a hearing on the Bank's objections to the representation election. In so doing, we note that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." N.L.R.B. v. A.J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). This court has considered the Board's authority to regulate elections as "plenary," Mosey Mfg. Co., Inc. v. N.L.R.B., 701 F.2d 610, 615 (7th Cir.1983) (en banc), and determined that "[t]he burden is on the challenger to show adequate reason for setting an election aside." Advertisers Mfg. Co. v. NLRB, 677 F.2d 544, 546 (7th Cir.1982). "That burden is 'heavy' requiring that the challenger produce 'specific evidence' of conduct so glaring as to impair employees' freedom of choice." Id. (citations omitted). Furthermore, "[t]he Board is entitled to rely on the Regional Director's report in the absence of specific exceptions supported by offers of proof of facts contrary to the Regional Director's findings." NLRB v. Chicago Marine Containers, Inc., 745 F.2d 493, 496 (quoting NLRB v. Advanced Systems, Inc., 681 F.2d 570, 572 (9th Cir.1982)). A party "is entitled to a hearing only when it raises substantial and material factual issues and proffers evidence that establishes a prima facie case for setting aside the election." Chicago Marine Containers, 745 F.2d at 496. We must determine whether the Board's conclusion that the Bank failed to present a prima facie case warranting an evidentiary hearing is supported by substantial evidence in the record. Id. at 496 n. 2. Accordingly, we examine the objections that State Bank raised against the election before the NLRB: (1) that the union (or union supporting employees) distributed an altered memo signed by the State Bank's president that misled the Bank's employees; (2) that union supporters defaced the official notice of election posted by the NLRB so as to mislead State Bank employees; and (3) that a letter the union distributed which alleged that State Bank discriminated against its employees on the basis of race prevented a fair election.
 
 A. The Altered Bank Memorandum
 
 57
 The State Bank's initial objection to the election alleged that the Union or employees supporting the Union distributed an altered copy of a memorandum signed by the Bank's Chief Deputy Manager, Mr. Bhattacharjee, to employee voters that misled the voters to believe that Mr. Bhattacharjee favored the union in the election. The original memo was distributed three days before the election and contained a series of questions and answers about the procedures of the representation election. The last line of the memo stated, "I urge each of you to vote ... and I sincerely hope you vote 'no'." The State Bank submitted evidence to the Regional Director revealing that shortly after the original Bank memo was distributed, at least three unit employees saw a copy of the memo that had been altered, to read "... I sincerely hope you vote 'yes '," which was in the possession of a known union supporter.
 
 
 58
 The Regional Director decided that this evidence did not support the inference that the Union or its agent altered the memo. The Regional Director also observed that the memo was only one of more than ten memoranda distributed by the State Bank concerning the election, and except for the altered memo, all of the memoranda made perfectly clear that the State Bank opposed certification of the union. In the judgment of the Regional Director, any voter who viewed the memorandum would realize that it was contrary to all other information the State Bank provided and thus was a hoax.
 
 
 59
 The State Bank argues that as a matter of law it is not required to fix responsibility for an alteration of a document to the union to set aside an election. It also contends that the evidence it presented permits an inference that the Union was responsible for the alteration and that a hearing would have uncovered additional facts to further support this inference. The State Bank also maintains that its evidence proves that at least one employee came forward and stated he was confused by the altered memo because the employee who brought the altered memo to the Bank's attention stated that he was in fact confused and wished to check the original.
 
 
 60
 In Midland National Life Insurance Co., 263 NLRB 127, 131 (1982), the Board held that it would set aside an otherwise valid election on the basis of a party's alleged campaign misrepresentations only when the manner of deception made voters incapable of recognizing "mere propaganda of a particular party ... for what it is."
 
 
 61
 "In sum, ... we will no longer probe into the truth or falsity of the parties' campaign statements, and ... we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is.... [W]e will continue to protect against other campaign conduct, such as threats, promises, or the like, which interferes with employee free choice."
 
 
 62
 263 NLRB 133.
 
 
 63
 The Bank established only that a Union supporter was in possession of the memo. The Bank has failed to establish that a party (here the Union) was responsible for the purported forgery. This court has traditionally upheld the NLRB's assertion that the improper acts of a third party are less damaging to the validity of an election than acts of the union or the employer. Tuf-Flex Glass v. NLRB, 715 F.2d 291, 296 (7th Cir.1983). See also NLRB v. ARA Services, Inc., 717 F.2d 57, 66 (3d Cir.1983) (Board policy of giving lesser weight to third party misconduct bears a rational relationship to the policies of the Act). In Tuf-Flex, we held that in the absence of conduct "by the union sufficient to signal to the employees that [an individual] was anything more than an enthusiastic supporter," the actions of the "most active 'union man' " were not attributable to the union. 715 F.2d at 296. Moreover, "[t]he test of agency in the union election context is stringent, involving a demonstration that the union placed the employee in a position where he appears to act as its representative." Id. (emphasis in original). Accepting the Bank's evidence as true, and applying this standard, we do not agree with the State Bank's conclusion that the union was responsible for the forged letter. The mere speculative hope that some person might testify at a hearing and implicate the union is insufficient to constitute a prima facie case that would require the NLRB to hold a hearing. As we have repeatedly held in analyzing the burden a party must meet to raise an issue of fact in avoiding summary judgment, "a party may not rest on mere allegations or denials ... [and] a bare contention that an issue of fact exists is insufficient to raise a factual issue." Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.1983). The Tuf-Flex standard is even stricter than the standard for avoiding summary judgment. A lesser standard would allow one who fears the outcome of the election to force the election to be set aside merely by creating a misrepresentation.
 
 
 64
 Furthermore, the Regional Director and the Board found that the State Bank's assertion that the forged letter "interfere[d] with employee free choice," Midland, id., was not credible. We will not overturn a Board decision based on findings that call into play the very knowledge, experience and expertise in labor problems that the Board possesses. The State Bank's numerous memoranda to the employees discussing the election should have made the employees aware of the State Bank's adverse opinion of the union. The only evidence the Bank presented to demonstrate voter confusion was that an employee checked with the Bank Supervisor once he realized that the forged letter was inconsistent with the Bank's stated policy against the union. Therefore, the Bank's own evidence established that the allegedly confused employee was well aware of how the company wanted employees to vote at the election.
 
 
 65
 Since the Bank failed to make a prima facie case that the Union was responsible for the alleged forgery and since the Regional Director reasonably concluded that voters were unlikely to be deceived, we affirm the Board's holding that no hearing concerning the alleged forgery was required.
 
 B. The Defaced Notice of Election
 
 66
 The State Bank's second objection to the election alleged that on two occasions an official notice of election containing a sample ballot posted in an employee lunchroom was defaced. On August 30 or 31, an unidentified person marked an "X" in the "yes" box (a vote for union representation) of the sample ballot. On September 1 another unknown person marked "X" on a piece of protective plastic directly over the "yes" box of the sample box. On the first occasion, the notice was replaced within twenty-four hours. On the second occasion, the "X" was wiped off the plastic covering on the morning of the election. The Regional Director accepted the Bank's allegations regarding the defaced sample ballots as true, and once more found that the State Bank had failed to establish that the Union was responsible for the alleged misconduct. The Regional Director "overruled" the State Bank's objection to the election, reasoning that it was "doubtful ... that employees would gain the impression that the Board was encouraging them to vote for that party in the election, especially where, as here, the notices were covered in an obvious (although unsuccessful) attempt to prevent further alteration." The State Bank asserts that the NLRB's decision to dispense with a hearing prevented the State Bank from proving that the Union was responsible. The Bank also contends that the altered sample ballots were fatal to the validity of the election, under the Board's recent decision in SDC Investments, Inc., 274 NLRB 78, 118 LRRM 1410 (1985).
 
 
 67
 In SDC, the Board held that distribution of copies of an official NLRB ballot handwritten in Spanish "Remember to Vote Yes ..." justified setting aside a certification election. "The crucial question [is] whether the altered ballot in issue is likely to have given voters the misleading impression that the Board favored one of the parties to the election.... We reject the view that the mere existence of an altered ballot is a per se violation...." 118 LRRM at 1412.
 
 
 68
 In SDC, the Spanish "Remember to Vote Yes...." was integrated into what purported to be an exact Spanish translation of the entire text of the Board's English Ballot. It is probable that those employees reading the Spanish version would not recognize that the "Remember to Vote Yes" constituted an alteration of the English version that they could not read. Those employees would therefore presume the Spanish version was an authentic translation and thus infer that the Board favored the union.
 
 
 69
 In the present case, the defacement of the posted sample ballot was an obvious alteration of the Board's Notice of Election. The defaced sample ballot contained language that made it clear that the Board did not favor the Union. For example, to the right of the defacement, the Notice explicitly reads: "The National Labor Relations Board as an agency of the United States Government does not endorse any choice in the election." Directly above this, in large blue letters, is printed "The National Labor Relations Board protects your right to a free choice."
 
 
 70
 The evidence presented by the State Bank establishes that the defacements were corrected shortly after they were discovered. The Notice was defaced for only a short period of time and if employees were continually scrutinizing the notice of election with the scrupulous attention to the Board's views that the Bank suggests they were, they would have noticed the corrected ballot and the language accompanying it that made it clear that the Board did not favor the Union.
 
 
 71
 Furthermore, as with the forged letter, the State Bank has failed to meet the Tuf-Flex "strict standard" prohibiting the weak inference that the union is responsible for the actions of unidentified persons. Accord N.L.R.B. v. Fuel Gas, 674 F.2d 529, 531 (6th Cir.1982) ("To hold that a simple incident involving an anonymous pencil marking penciled on a sample ballot automatically indicates an unfair election would [be] beyond the limits of reason and common sense.")
 
 
 72
 The Bank failed to produce any evidence linking the Union, rather than an over-zealous union supporter with marking the sample ballots. Furthermore, the altered ballots displayed with the official notice of election were quickly replaced by unaltered ballots, and the Bank has offered no evidence to contradict the Regional Director's and the Board's expert judgment that employees were unlikely to be misled. Therefore, we uphold the decision of the Board and the Regional Director that the State Bank failed to make a prima facie case necessitating a hearing on this objection.
 
 
 73
 C. The alleged "appeal to racial prejudice."
 
 
 74
 A Union letter dated August 18 distributed to eligible employee voters stated in part:
 
 
 75
 "The State Bank of India is trying to keep depressed conditions and low wages for its employees, because most of you are of Indian nationality and other minority groups."
 
 
 76
 The State Bank filed its objections with the Regional Director that this letter's reference to racism so tainted the election atmosphere that a fair election could not be held. The Regional Director concluded that the letter "does not evince the prohibited motive of inflaming racial hatred merely to obtain votes.... Rather [the union's] message to employees appears to be a permissible attempt to encourage racial pride and concerted action by minority group employees to better their wages and working conditions."
 
 
 77
 The Board has held that there is no shelter or absolution for a party's attempt to force the election or defeat of a union by arousing vicious race-hatred. Sewell Mfg. Co., 138 NLRB 66 (1962). The free choice and fairness in union elections that Congress intended will be swept aside by an undertow of inflamed racial prejudice. We have joined with other courts in upholding the Board's policy, that an otherwise valid election will be set aside when a party "deliberately seek[s] to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals." Sewell, 138 NLRB at 72. See, e.g., Peerless of America v. N.L.R.B., 576 F.2d 119, 125 (7th Cir.1978); N.L.R.B. v. Utell Int'l, 750 F.2d 177, 179 (2d Cir.1984); N.L.R.B. v. Silverman's Men's Wear, Inc., 656 F.2d 53 (3d Cir.1981); N.L.R.B. v. Baltimore Luggage Co., 387 F.2d 744 (4th Cir.1967); N.L.R.B. v. Sumter Plywood Corp., 535 F.2d 917 (5th Cir.1976); Arlington Hotel Co., Inc. v. N.L.R.B., 712 F.2d 333 (8th Cir.1983).
 
 
 78
 We must examine allegedly inflammatory racial appeals to determine if they are truly racially inflammatory and assess the relationship of an inflammatory racial appeal to the overall theme of the campaign. Peerless, supra. Much hangs on these two determinations, for "[i]f ... racial or sexual remarks ... do not form the core or theme of the campaign ... and if the remarks are not inflammatory, they should be reviewed [only] under the standards applied to other types of misrepresentation." Peerless, 576 F.2d at 125. These "standards applied to other types of misrepresentation" are precisely those Midland standards we discussed above in analyzing the forged Bank letter: the NLRB will intervene in an election only if "voters are unable to recognize propaganda for what it is." Midland National Life Insurance Co., 263 NLRB 127, 133 (1982).
 
 
 79
 A statement is racially inflammatory if on its face it is intended to produce or exploit strong racial prejudice, and is in fact likely to produce or exploit such racial prejudice. Cf. Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969); Collin v. Smith, 578 F.2d 1197, 1203-04 (7th Cir.), cert. denied, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). In the present case, the text of the disputed statement ("The State Bank of India is trying to keep depressed conditions and low wages for its employees, because most of you are of Indian nationality and other minority groups") urges the employees to vote for the union not by appealing to and arousing their racial prejudice, but rather by contending that the Bank itself was taking advantage of their inability to protect their own interest because of their minority status. Unlike Sewell, where the employer urged the employees to vote against the union because the union was involved with black people, here the union is urging the employees to vote for the union to prevent discrimination. This distinction between arousing race hatred and characterizing an employer's actions as discriminatory brings this case squarely within our holding in Peerless, 576 F.2d at 122, that a union's claim that management discriminated on the basis of race, sex and national origin was not an inflammatory racial appeal. Accord N.L.R.B. v. Utell Intern, Inc., 750 F.2d 177, 179 (2d Cir.1984). As the Board concluded in Sewell, "a relevant campaign statement [should not] be condemned because it may have racial overtones." 138 N.L.R.B. at 71. Although the Union's statement here had "racial overtones," the statement was relevant to the working conditions and wages of the employees the union sought to represent.
 
 
 80
 Nor does the Union's alleged racial appeal satisfy the second prong of the analysis--that the alleged inflammatory racism be sufficiently close to the core theme of the campaign. The Union remark was a single sentence at the end of a long letter urging support for the union. This long letter in turn was one of many communications from the union to the employees presenting reasons for voting for the union. Thus this case is very different from previous cases in which racially inflammatory appeals were at the core of an election campaign. For example, in NLRB v. Katz, 701 F.2d 703 (7th Cir.1983), allies of the union discussed the movie " 'Holocaust' with the employees and also stated [Mr.] and Mrs. Katz are Jewish and they're getting rich while we're getting poor." On another occasion an employee told other employees that "Jews killed the Nazis-- ... the Jews marched in Skokie to keep the blacks out." The remarks in Katz were central to the union campaign while the remark before us in this case was isolated. While the comment in this case addresses the working conditions and wages of the employees, the comments in Katz discussing the Holocaust and Jews killing the Nazis were not relevant to any issues in the representation election. Furthermore, as in NLRB v. Chicago Marine Containers, Inc., 745 F.2d 493 (7th Cir.1984), the union statement concerned a matter arguably within the knowledge of the employees, i.e., whether the State Bank had racist intentions. "Therefore, the employees ... were entirely capable of evaluating the statements for what they were--mere opinions." Id. at 498. The record thus contains substantial evidence supporting the Board's decision that the Bank failed to establish a prima facie case of racially inflammatory conduct and therefore was not entitled to a hearing.
 
 IV
 
 81
 The orders of the National Labor Relations Board are ordered ENFORCED.
 
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 A "stipulation for certification upon consent election" is an agreement among labor, management and the NLRB that an election by specified voters to determine representation for a specified bargaining unit "shall be held" at a particular place and time. A stipulation of this nature replaces the hearing to determine whether a "question of representation affecting commerce exists" that is otherwise required by 29 U.S.C. Sec. 159(c) in order to ascertain whether the Board should direct that an election be held. At the time the Bank entered into the stipulation, it pointed out that it was neither an employer within the meaning of the NLRA nor an employer over which the Board should exercise its discretionary jurisdiction
 
 
 [2]
 The record is not clear as to the precise number of American citizens employed by the State Bank. In the Chicago branch, it appears that nine out of eleven clerical employees were American citizens. In the New York branch, forty percent of the non-managerial employees were American citizens. Most of the employees who were not American citizens were of Indian origin but were awaiting naturalization proceedings in this country
 
 
 [3]
 The February 23, 1983, decision reaffirmed a prior decision of the Board dated May 20, 1977, wherein the NLRB, noting the large and ever-increasing participation by foreign and foreign-controlled banks in the United States, "reexamine[d] its past policy of refusing to exercise jurisdiction over commercial activities of foreign governments or their agents occurring within the United States." State Bank of India and Chicago Int. Bd. Amalgamated Clothing and Textile Workers Union, AFL-CIO, 229 NLRB 838
 In State Bank of India and Chicago Int., the NLRB reversed the Regional Director's decision not to assert jurisdiction, overruled its prior decisions, and directed that an election be held at the Chicago branch of the State Bank. Alluding to the structure of Sec. 2(2), (quoted at n. 7, infra ) that grants jurisdiction over "any" person acting as an employer and excludes only very specifically limited exceptions, the Board wrote:
 "On this point, it seems enough to observe that (the Bank) is not within the terms of the exclusions ... (The Bank) asserts that (the Union) has failed to demonstrate an 'affirmative intention of the Congress' to confer jurisdiction over an employer that is virtually the alter ego of the Government of India ...' Under our construction of the jurisdictional provisions of the Act, it is the (Bank) who has failed to demonstrate any congressional intent to exclude such employees from the coverage of the Act or to preclude the Board from exercising jurisdiction."
 
 
 [229]
 NLRB at 840
 The Board also rejected the Bank's argument that it would be an abuse of discretion for the Board to exercise jurisdiction over the Bank in light of the Board's earlier decisions concerning jurisdiction over foreign-owned concerns doing business in this country. We discuss this part of the Board's decision below, in Sec. II.C.
 
 
 [4]
 Section 8(a)(1) provides:
 "It shall be an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in Sec. 7 of this Title."
 29 U.S.C. Sec. 158(a)(1).
 Section 8(a)(5) provides:
 "It shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees, subject to the provisions of Sec. 9(a) of this title."
 29 U.S.C. Sec. 158(a)(5).
 An employer's unilateral increase in wages constitutes an outright refusal to bargain and is therefore an unfair labor practice under Sec. 8(a)(5). N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).
 
 
 [5]
 Direct review of the Board's decision to certify a union is available only in "very limited circumstances," none of which are present. Peerless of America, Inc. v. N.L.R.B., 576 F.2d 119, 121 n. 2 (7th Cir.1978); Herald Co. v. Vincent, 392 F.2d 354, 357 (2d Cir.1968). The Bank therefore obtained review of the union certification by petitioning this court for review of the Board's decision that the Bank had committed an unfair labor practice in refusing to bargain with the union. See Peerless, 576 F.2d at 121
 
 
 [6]
 Although the State Bank petitioned this court for review of both NLRB orders, it has briefed only the issues raised in the order reported at 273 NLRB No. 38 and rests its objection to the decision reported at 273 NLRB No. 39 on the arguments set forth in its brief. Both the Bank and the Board agree that if the court grants enforcement of the first order, reported at 273 NLRB No. 38, it also should enforce the order reported at No. 39. Conversely, the parties agree that if the court denies enforcement of the order in No. 38, the court should also deny enforcement of the NLRB order reported at No. 39 (Pet.Br. at 2; Resp.Br. at 8)
 Although the dispute arises out of events in New York City, 29 U.S.C. Sec. 160(f) permits the State Bank to obtain review of the Board orders "wherein [the Bank] resides or transacts business." In this case, petitioner State Bank of India also maintains an office and transacts business in Chicago, Illinois.
 
 
 [7]
 Section 2(2) of the NLRA provides:
 "The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."
 29 U.S.C. Sec. 152(2).
 
 
 [8]
 NLRA Sec. 2(2) is quoted in full at n. 7 supra
 
 
 [9]
 See note 2, supra
 
 
 [10]
 28 U.S.C. Secs. 1330, 1602-1611. The statute provides for jurisdiction in the federal courts to determine claims by foreign states to sovereign immunity from liability for their acts. Sec. 1604 provides for immunity from jurisdiction of U.S. and state courts except as provided in Secs. 1605 and 1607
 
 
 [11]
 See supra, at 530
 
 
 [12]
 As articulated by the concurrence in Chaney, there may be review where (1) an agency decides as a matter of law that it may not enforce a statute; (2) an agency engages in a pattern of non-enforcement of clear statutory language; (3) an agency has refused to enforce a regulation lawfully promulgated and still in effect; or (4) a non-enforcement violates constitutional rights. 105 S.Ct. at 1660